HOMETOWNE ASSOCIATES, L.P.
d/b/a Unity Park, Petitioner,

v.

James P. MALEY, Jr., Township
Assessor of Center Township,
Marion County, Respondent.

No. 49T10–0208–TA–98.

Tax Court of Indiana.

Dec. 16, 2005.

Larry J. Stroble, Barnes & Thornburg, Indianapolis, for Petitioner.

Steve Carter, Attorney General of Indiana, Robert B. Wente, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, J.

Hometowne Associates, L.P. d/b/a Unity Park (Unity Park) appeals from a final determination of the Indiana Board of Tax Review (Indiana Board) valuing its real property for the 2001 assessment (the year at issue). The sole issue for the Court to decide is whether the Indiana Board erred in denying an obsolescence adjustment to Unity Park.

## FACTS AND PROCEDURAL HISTORY

Unity Park is a scattered-site,[1] low-income housing development located just north of downtown Indianapolis. The development consists of 60 rental units, each with either two, three, or four bedrooms, and is located in an area designated by the City of Indianapolis as "blighted."

Constructed in the mid 1990's, Unity Park was financed and operates under two federal housing programs. First, Unity Park was designed as low-income housing to qualify for tax credits pursuant to section 42 of the Internal Revenue Code.[2] Under this program, Unity Park's developers received approximately $5.3 million in tax credits to award to investors[3] who provided financing for the project. In addition, Unity Park is subject to the provisions of Section 8 of the United States Housing Act of 1937, which is administered by the Department of Housing and Urban Development (HUD). *See, generally,* 42 U.S.C. § 1437 (2005). By participating in this program, Unity Park agrees to charge only those rental rates as dictated by

---

1. A scattered-site housing development consists of parcels that are generally non-contiguous. In this case, Unity Park's rental units are situated on approximately five acres, scattered between Central Avenue and Alabama Street (east to west), and 22nd and 24th streets (south to north).

2. Federal law provides numerous tax incentives to encourage the production of affordable housing for low-income individuals, including the Low Income Housing Tax Credit (LIHTC) Program at issue here. *See, generally,* 26 U.S.C. § 42 (2005). The LIHTC Program authorizes individual states to issue federal income tax credits to developers as an incentive for the acquisition, rehabilitation, or new construction of affordable rental housing. In Indiana, this program is administered by the Indiana Housing Finance Authority (IHFA).

To qualify for LIHTCs, a project must reserve a portion of its rental units for use by low-income households only, with rents on those units limited to a percentage of qualifying income. Furthermore, the use of the property is restricted by deed to low-income housing for at least fifteen years. In the event that a project does not comply with such restrictions, the credits are subject to recapture.

After the state allocates the tax credits to a project's developers, the credits are usually sold to private investors in a limited partnership. The money paid for the credits is used as equity financing to make up the difference between a project's development costs and the non-tax.credit financing expected from rental income. In turn, the private investors are able to use the tax credits to offset their federal income tax liabilities, claiming the credits for each year of a ten-year period as long as the imposed rental restrictions are met. If a property eligible for § 42 credits is sold, the subsequent owner of the property is entitled to the future tax credits associated with the property.

3. Unity Park is owned by Hometowne Associates, L.P. (Hometowne), an Indiana limited partnership. Hometowne's general partner is Unity Housing, Inc. In turn, Unity Housing, Inc. is owned by Indianapolis Neighborhood Housing Partnership, King Park Area Development Corporation, and Unity Residents' Council, Inc. Hometowne's limited partner is the National Equity Fund, 1994 Limited Partnership.

HUD.[4] In turn, however, HUD subsidizes approximately 70% of those rental charges.

For the 2001 assessment, James P. Maley, Jr., the Center Township Assessor (Assessor), assigned Unity Park an assessed value of $2.2 million. Believing this value to be too high, Unity Park filed an appeal with the Marion County Property Tax Assessment Board of Appeals (PTABOA). On August 24, 2001, the PTABOA sustained the Assessor's valuation of the property.

Unity Park subsequently appealed the PTABOA's determination to the State Board of Tax Commissioners (State Board) alleging that the Assessor failed to recognize that its property was suffering from obsolescence. On February 20 and 27, 2002, the Indiana Board[5] held an administrative hearing on the matter. On June 20, 2002, the Indiana Board issued a final determination upholding the PTABOA's assessment.

Unity Park filed this original tax appeal on August 1, 2002. The Court heard the parties' oral arguments on May 29, 2003. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

■ This Court gives great deference to final determinations of the Indiana Board. *Wittenberg Lutheran Vill. Endowment Corp. v. Lake County Prop. Tax Assessment Bd. of Appeals,* 782 N.E.2d 483, 486 (Ind. Tax Ct.2003), *review denied.* Conse-

quently, the Court may only reverse a final determination of the Indiana Board if it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND. CODE § 33–26–6–6(e)(1)—(5) (West 2005).

■ The party seeking to overturn the Indiana Board's final determination bears the burden of proving its invalidity. *See Clark v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1230, 1233 (Ind. Tax Ct.1998). In order to meet that burden, the party seeking reversal must have submitted, during the administrative hearing process, probative evidence regarding the alleged assessment error. *See id. See also State Bd. of Tax Comm'rs v. Gatling Gun Club,* 420 N.E.2d 1324, 1328–29 (Ind.Ct.App.1981) (stating that only evidence submitted at the administrative level is subject to judicial review).

## DISCUSSION

In 2001, real property in Indiana was assessed on the basis of its "true tax val-

---

4. During the year at issue, the HUD-imposed rental rates for Unity Park were: $523 per month for a two-bedroom unit; $660 per month for a three-bedroom unit; and $735 per month for a four-bedroom unit. Both parties to this case agree that these rates ("contract rents") were higher than those generally obtained from other, non-subsidized apartment housing in the local market ("market rents").

5. On December 31, 2001, the legislature abolished the State Board of Tax Commissioners (State Board). 2001 Ind. Acts 198 § 119(b)(2). Effective January 1, 2002, the legislature created the Indiana Board of Tax Review (Indiana Board) as "successor" to the State Board. IND. CODE ANN. §§ 6–1.5–1–3; 6–1.5–4–1 (West Supp.2004–2005); 2001 Ind. Acts 198 § 95.

ue." IND. CODE ANN. § 6–1.1–31–6(c) (West 2001). A property's true tax value was not its fair market value, but rather the value as determined under Indiana's own assessment regulations. *See id.*

Under these assessment regulations, a commercial improvement's true tax value was equal to its reproduction cost less any physical and/or obsolescence depreciation present therein. *See* IND. ADMIN. CODE tit. 50, r. 2.2–10–7(e) (1996). Reproduction cost was defined as the "whole-dollar cost of reproducing the item." IND. ADMIN. CODE tit. 50, r. 2.2–10–5(d)(13) (1996). Nevertheless, the reproduction cost of an improvement was not the *actual* cost of reproducing the item but rather the cost as specified in the assessment regulations. *See* IND. ADMIN. CODE tit. 50, r. 2.2–10–6.1 (1996); IND. ADMIN. CODE tit. 50, r. 2.2–11–5.1 (1996); IND. ADMIN. CODE tit. 50, r. 2.2–11–6 (1996).

In turn, the assessment regulations defined obsolescence depreciation as either the functional or economic loss of value to a property. 50 IAC 2.2–10–7(e). For instance, functional obsolescence (or a loss of value resulting from factors internal to the property) could be caused by the fact that an improvement had limited use due to an irregular or inefficient floor plan, inadequate or unsuited utility space, or an excessive/deficient load capacity. *See id.* In contrast, economic obsolescence (or a loss of value resulting from factors external to the property) could be caused by the fact that an improvement was located in an inappropriate area, subject to inoperative or inadequate zoning ordinances or deed restrictions, constructed for a need which has subsequently been terminated due to actual or probable changes in economic or social conditions, or the manufacture of the product for which the improvement was originally constructed has suffered from decreased market acceptability. *Id.*

While the assessment regulations explained that obsolescence depreciation was to be applied as a percentage reduction (ranging from 0% to 95%) against an improvement's reproduction cost, they provided no explanation as to how to calculate how much obsolescence was actually present in an improvement. Nevertheless, this Court has held that because the assessment regulations tied the definition of obsolescence directly to that as applied by professional appraisers in calculating a property's fair market value, obsolescence under the true tax value system necessarily incorporated market value concepts. *See Canal Square Ltd. P'ship v. State Bd. of Tax Comm'rs,* 694 N.E.2d 801, 806, n. 8 (Ind. Tax Ct.1998). Consequently, the Court has accepted the use of generally recognized appraisal methods for quantifying obsolescence as a permissible means of quantifying obsolescence under the true tax value system. *See Clark,* 694 N.E.2d at 1242, n. 18. *See also Lacy Diversified Indus., Ltd. v. Dep't of Local Gov't Fin.,* 799 N.E.2d 1215, 1223 (Ind. Tax Ct.2003); *Inland Steel Co. v. State Bd. of Tax Comm'rs,* 739 N.E.2d 201, 211 (Ind. Tax Ct.2000), *review denied; Canal Square,* 694 N.E.2d at 806–807; *Thorntown Tel. Co. v. State Bd. of Tax Comm'rs,* 588 N.E.2d 613, 619 (Ind. Tax Ct.1992).

When a taxpayer seeks an obsolescence adjustment, it is required to make a two-pronged showing: first, it must identify the causes of the obsolescence, and second, it must quantify the amount of obsolescence to be applied. *See Clark,* 694 N.E.2d at 1238. Each of these prongs, however, requires a connection to an actual loss in property value. For example, when identifying causes of obsolescence, a taxpayer must provide probative evidence that identifies the existence of specific factors that are causing obsolescence in its improvement. *Id.* In other words, the tax-

payer *must show* how these factors are causing an *actual* loss of value to its property. *See Miller Structures, Inc. v. State Bd. of Tax Comm'rs,* 748 N.E.2d 943, 954 (Ind. Tax Ct.2001). In the commercial context, this loss of value usually means a decrease in the property's income-generating ability. *See id.* at 953. Only after this showing has been made does the taxpayer proceed to the second-prong: the quantification of obsolescence.[6] This prong requires the taxpayer to convert the actual loss of value (shown in the first prong) into a percentage reduction and apply it against the improvement's overall true tax value. *See Lacy Diversified,* 799 N.E.2d at 1223.

▪ At the administrative hearing, Unity Park presented, *inter alia,* the testimony of an expert witness, Mr. Hank Rassel, an appraiser certified as a Member of the Appraisal Institute (MAI), together with his appraisal[7] valuing Unity Park as of August 1, 2001. In both his appraisal and his testimony, Mr. Rassel claimed that six different factors were negatively impacting Unity Park's ability to generate income:

*1. Excess Operating Expenses[:]* ... the main cause of obsolescence affecting [Unity Park] was that the contract rents permitted by the HUD contract were not sufficient to offset [its] operating expenses[.] The scattered[-]site nature of the project caused higher expenses, such as insurance costs, repair and maintenance costs, and administrative costs, than a typical apartment complex.

\* \* \* \* \* \*

*2. Location[:]* ... the area in which Unity Park is located is not a particularly desirable area, having a relatively high crime rate and many burned out and abandoned buildings.... "[N]egative activity" in the area ... affected the subject property and contributed to lower obtainable rent, higher expenses, and higher vacancy.

*3. Four–Bedroom Units[:]* ... four-bedroom units ... could be considered an "overimprovement" of the property.... The four-bedroom units were difficult to rent because HUD required that they be occupied by families of a certain size, and there were not enough families of that size to meet the requirements.

*4. Vandalism[:]* ... because of its location and scattered[-]site character, Unity Park incurred significant repair costs related to vandalism of vacant units.

*5. HUD Limitations[:]* Under the agreement with HUD, 100% of the Unity Park units had to be rented to low[-]income individuals.

*6. Damage Limitations[:]* HUD's local agent, the Indianapolis Housing Agency, did not permit [Unity Park] to pursue claims for damages beyond forfeiture of security deposits.

(Pet'r Br. at 10–13 (footnotes omitted).) (*See also* Cert. Admin. R. at 697–98, 1703–04.) In other words, Unity Park claims that due to its scattered-site nature in a blighted area, it has incurred greater costs (as compared to traditional apartment housing) in maintaining and administering the project; in turn, it is not able to

---

**6.** Indeed, "[w]here there is no cause of obsolescence, there is no obsolescence to quantify." *Lake County Trust v. State Bd. of Tax Comm'rs,* 694 N.E.2d 1253, 1257 (Ind. Tax Ct.1998), *review denied.*

**7.** Mr. Rassel's appraisal was completed in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation and the Standards of Professional Practice of the Appraisal Institute. (Cert. Admin. R. at 673.)

generate additional revenue (by raising rents or by collecting damages from tenants) to offset these higher costs, due to the rental restrictions/limitations imposed on it by HUD.

To substantiate the claim that these factors were causing a loss in property value, Mr. Rassel's appraisal included an operating expense history of Unity Park from 1998 to 2000. This history shows that repair and maintenance expenses at Unity Park increased substantially over the three-year period. (*See* Cert. Admin. R. at 720.) Mr. Rassel's appraisal also compared those expenses to average expenses for non-subsidized, non-scattered-site apartment housing in the area—Unity Park's expenses for both grounds maintenance and improvement repair/maintenance were higher. (*See* Cert. Admin. R. at 719–21.) Finally, Mr. Rassel's appraisal included a rent roll showing that while Unity Park's vacancy rate of 10% was lower than the market statistic, of that 10% approximately 83% was attributable to the lack of tenants who qualified for placement in the four bedroom units at Unity Park.[8] (*See* Cert. Admin. R. at 698, 718 (footnote added).)

Next, Unity Park presented two separate calculations to quantify the amount of obsolescence to which it believed it was entitled. Pursuant to these calculations, Unity Park claims that its property's loss of value (resulting from the various causes of obsolescence described *supra* ) translates into an obsolescence adjustment of 84.4%. In the alternative, Unity Park claims that it is entitled to, at the very least, an obsolescence adjustment of 31.3%.

Under its first calculation, Unity Park compared its property's fair market value as determined under the income capitaliza-

tion approach with its fair market value as determined under the cost approach—the difference being attributable to the obsolescence present in the property. Unity Park then converted the difference to an obsolescence percentage reduction. This has been accepted as a valid methodology for quantifying obsolescence under the true tax value system. *See Lacy Diversified,* 799 N.E.2d at 1224–25; *Canal Square,* 694 N.E.2d at 806–807; *Thorntown Tel. Co.,* 588 N.E.2d at 619.

■ In applying the income capitalization approach,

the income expected to be earned by the subject property is estimated, allowing for reasonable expenses, vacancy, and/or collection loss, to arrive at net operating income (NOI). The NOI is subsequently converted to a present value by dividing it by a capitalization rate. The capitalization rate generally reflects the annual rate of return necessary to attract investment capital and is influenced by such factors as "apparent risk, market attitudes toward future inflation, the prospective rates of return for alternative investments, the rates of return earned by comparable properties in the past, the supply of and demand for mortgage funds, and the availability of tax shelters."

*Lacy Diversified,* 799 N.E.2d at 1224 (citations omitted). Consequently, Mr. Rassel determined that, based on its rents as dictated by HUD, Unity Park's annual potential gross income was $477,552. (Cert. Admin. R. at 717.) He subsequently allowed for a 12% vacancy and collection loss, added other miscellaneous income,

---

**8.** In other words, six of sixty units at Unity Park were vacant as of March 1, 2001 (for an overall vacancy rate of 10%). Of the six units that were vacant, five of them were the four bedroom units.

deducted fixed and variable expenses [9] (as well as reserves), to arrive at a net operating income (NOI) of $97,074. (*See* Cert. Admin. R. at 718–25.) Then, based on actual market sales data, national investor surveys, and band of investment (weighted averages), Mr. Rassel applied a capitalization rate of 13% to Unity Park's NOI, estimating that Unity Park's fair market value was $750,000. (*See* Cert. Admin. R. at 726–28.)

■ Under the cost approach to market value, an appraiser estimates the cost to construct a reproduction of, or replacement for, the existing structure (typically through use of the Marshall & Swift Valuation Service cost index) and then deducts all accrued depreciation in the property. *Lacy Diversified,* 799 N.E.2d at 1224 (citation omitted). In the case at bar, Mr. Rassel determined that the total cost to construct a replacement facility for Unity Park was $4,560,299. (*See* Cert. Admin. R. at 714.) Mr. Rassel then deducted the amount of physical depreciation that Unity Park had experienced ($585,048), as well as the value of the personal property located in the improvements ($17,850). (*See* Cert. Admin. R. at 714, 705–12, 1026.) Thus, Mr. Rassel concluded that the replacement cost of Unity Park's improvements after physical depreciation, but before obsolescence, was $3,957,401. (*See* Cert. Admin. R. at 714–15, 1026.) Mr. Rassel then added back the value of the land ($115,000) and the value of the personal property ($17,850) for a total estimated property market value (before obsolescence) of $4,090,251 (rounded to $4,090,000). (*See* Cert. Admin. R. at 714–15, 1026.)

Mr. Rassel's next step was to correlate the replacement cost of Unity Park's facility with the market value of the property as derived under the income capitalization method. In so doing, Mr. Rassel computed the amount of obsolescence present in Unity Park to be $3,340,000 ($4,090,000 less $750,000). (Cert. Admin. R. at 714, 1702.) Accordingly, Unity Park contends it is entitled to an 84.4% obsolescence reduction against its true tax value.[10] (*See* Cert. Admin. R. at 714, 1702 (footnote added).)

In its second obsolescence calculation, Unity Park adjusted the 84.4% obsolescence figure to reflect the value of the federal income tax credits still available for use by Unity Park's investors.[11] Under this calculation, Unity Park claims that it is entitled to, at the very least, an obsolescence adjustment of 31.3%.

---

9. Unity Park's fixed expenses included real estate taxes and insurance; its variable expenses included management fees, payroll, utilities, and repair and maintenance. (*See* Cert. Admin. R. at 720.)

10. $3,340,000 is 84.4% of the replacement cost of Unity Park's improvements (after physical depreciation) (i.e., $3,957,401).

11. Unity Park maintains that because the federal income tax credits received by its investors under the LIHTC program do not affect the amount of rent that can be collected by the property and do not serve to increase the operating expenses incurred by the property, they should not be used to "discount" the amount of the obsolescence affecting the property. (*See* Pet'r Br. at 27.) Instead, it argues that because the federal income tax benefits constitute intangible property, their value should be excluded from Unity Park's market value calculation. (*See, e.g.,* Pet'r Br. at 23–28 (citing IND. CODE ANN. § 6–1.1–10–39 (West 2001) (providing that intangible personal property is exempt from Indiana's property tax)).) Thus, Unity Park's second calculation is actually an "alternative" calculation: it has been prepared for use only in the event that the Court determines that the value of the income tax credits must be considered when evaluating the presence of obsolescence in a property. (*See* Pet'r Br. at 28.)

In valuing the remaining [12] tax credits, Mr. Rassel first reduced Unity Park's total tax credit award of $5,300,800 by the value of the tax credits that had been claimed as of January 1, 2001 ($2,650,400). Mr. Rassel, through consultation with an investment company, then determined that because the remaining credits could be purchased for only 80% of their worth, they carried a market value of $2,120,320 ($2,650,400 × 80%).[13] (*See* Cert. Admin. R. at 683–84.) Applying a rounded $2,100,000 as an offset against the $3,340,000 obsolescence figure determined in the first quantification calculation, Mr. Rassel computed the net amount of obsolescence present in Unity Park to be $1,240,251. (Cert. Admin. R. at 1720–21.) Accordingly, Unity Park maintains that if the value of the federal income tax credits are to be considered when evaluating the amount of obsolescence present in its property, it is entitled to a 31.3% [14] obsolescence adjustment.

■ By introducing an appraisal that identified and quantified obsolescence in accordance with generally recognized appraisal principles, Unity Park established a prima facie case that it was entitled to an obsolescence depreciation adjustment of at least 31.3%.[15] Thus, it was incumbent on the Assessor to rebut Unity Park's case. *See Clark,* 694 N.E.2d at 1233. This, however, the Assessor did not do.

At the administrative hearing, the Assessor was represented by Brian McHenry from the Marion County Assessor's office. Mr. McHenry generally questioned all of Unity Park's witnesses, including Mr. Rassel. In none of these exchanges, however, did Mr. McHenry offer evidence rebutting the validity of Mr. Rassel's calculations. Rather, he merely asked open-ended questions or made conclusory statements:

> I guess one [ ] question I[ ] have [i]s ... you['re] basing some of your obsolescence claim on vacancy ... in 2000 you had a higher rate of vacancy th[an] you did on March 1st, 2001, yet you didn't file an appeal. Was that because of the fact that you still had an abatement? ... Just seemed kind of strange that the abatement runs out and all of a sudden we are now having a vacancy problem that we need to address[.]

> \*　　\*　　\*　　\*　　\*　　\*

> Have you ever provided the County or the Township with any police action reports to substantiate your claim of neighborhood non-desirability[?]

> \*　　\*　　\*　　\*　　\*　　\*

> Can you ... explain why you feel ... why you are entitled to obsolescence for things that other commercial housing owners consider part of doing business, such as soiled carpet, burned counter-

---

**12.** Unity Park initially received $5,300,800 million in tax credits to be used during a ten-year period. As of the March 1, 2001 assessment date, five years of those credits remained for use. (*See* Cert. Admin. R. at 683–84.)

**13.** Mr. Rassel also used a second method to determine the present value of the tax credits: he multiplied the credits available annually ($530,000) by a five-year period at a 9% yield rate. This calculation places the present value of the remaining tax credits at $2,061,826. (Cert. Admin. R. at 684.)

**14.** $1,240,000 divided by $3,957,401 is 31.3%.

**15.** Indeed, obsolescence from several causes increased Unity Park's operating expenses yet limited its ability to increase gross revenues, thereby negatively impacting its overall production of income. This evidence sufficiently overcomes both prongs of the *Clark* standard: Unity Park showed how various obsolescence factors caused an actual loss of value to its property, and then used a valid methodology for quantifying that obsolescence.

tops, damaged cabinets, soiled drywall ceilings... I'm still trying to figure out how they soil a drywall ceiling and get $1,800 to replace it. Can you explain why you feel you['re] entitled to obsolescence when other people in the same line of work, business, consider it as standard ... doing business, as a risk of doing business?

\*  \*  \*  \*  \*  \*

Do you have a set of standards that your tenants must follow ... are there certain things they must abide by whether it comes to damage ... are they allowed ... I guess what I'm trying to say just because they're low-income families does not take away their sense of responsibility[.]

\*  \*  \*  \*  \*  \*

Our position's very simple ... [t]o claim 84% obsolescence is warranted using Section 42 tax credits is ludicrous. And to demand 31% ... is even more so. Due to federal tax incentives for Section 42 owners, the rent restrictions are not a factor.

\*  \*  \*  \*  \*  \*

Any lawn care expense calculated into the overall income expense report needs to be deducted [i]f obsolescence [is] to be even considered.... [Y]ou can tell by these pictures ... there's absolutely no lawn care whatsoever, unless they ra[ ]ked the dirt.

\*  \*  \*  \*  \*  \*

I feel the obsolescence calculated on these is worthless. The damaged cabinets, burned countertops, soiled walls and worn carpet are not reasons to apply obsolescence; this is the cost of doing business. [Unity Park] accepted this landlord expense when [it] decided to undertake this venture. [Unity Park] has the legal right, according to [Unity Park it doesn't], ... to pursue the tenants in a court of law to collect money as owed due to damages. Because tenants are low income families, does not mean they can not be held accountable for their actions. They do not have the right to destroy whatever they want without fear of punishment, although in this case it looks like they can get away with it scot-free, and their status does not allow them to shir[k] th[eir] responsibility. [Unity Park] ... should be ... making the tenants live up to standards that are expected in other rental situations.

(Cert. Admin. R. at 1672–73, 1733, 1737–38, 1739–40, 1741–42, 1743–44, 1748.) Such statements fail to impeach or rebut Unity Park's evidence identifying and quantifying the obsolescence depreciation present in its property. Consequently, the Assessor failed to rebut Unity Park's prima facie case.

Nevertheless, the Indiana Board determined that Unity Park was not entitled to an obsolescence adjustment for two reasons. First, it determined that "[Unity Park] did not show how the alleged causes of obsolescence cause the property to suffer from a loss of value." (Cert. Admin. R. at 569.) As the Indiana Board explained:

[Unity Park] presented evidence and testimony that the contract rents are above the market rents for the area and the government pays part of the rents. In addition to above market rents, the subject received over $5 million in tax credits ... Furthermore, the subject property is experiencing a vacancy rate that is less than the area average. In fact, if there were no restrictions on the subject property[y] the owners would be receiving less rent and no tax credits. [Thus, i]n this situation, [Unity Park] has not shown how the [HUD] restric-

tions imposed cause a loss of value in the property. If anything, [it] has shown that without the restrictions, the property would be less valuable.

(Cert. Admin. R. at 569.) In turn,

[Unity Park] has not performed the weighing of the benefits against the increased burdens. This is different from valuing the tax credits for the market value approach found in the appraisal. The weighing should focus on the value of the benefits (over market rents and tax credits, etc.) against the increased burdens (insurance, administrative expenses, excess damages, etc.). No such weighing was done in this appeal.

(Cert. Admin. R. at 570.)

In the alternative, the Indiana Board held that if Unity Park did indeed identify causes of obsolescence that were causing its property to lose value, then "[Unity Park] failed to meet its burden in the quantification of obsolescence." (Cert. Admin. R. at 572.) More specifically, the Indiana Board stated that Unity Park's quantification calculation "was flawed" because:

a. When totaling the expenses of a property for purposes of an ad valo-

rem valuation, the property taxes are not to be included;

b. The cost approach calculation ... indicates that the total replacement cost new of the subject improvements is $4,560,299 while the Total Tax Credit Award of the Section 42 tax credits [ ] is indicated at $5,300,800; therefore any risk associated with the project has been reduced or eliminated. The amount of risk premium in the band of investment determination of the income capitalization rate therefore comes under suspicion; and

c. Other attempts to support the selection of 13% as the appropriate income capitalization rate are not successful. The appraisal did not utilize the sales comparison approach due to a lack of comparable sales, but then included a calculation for an income capitalization rate based on estimated sales prices of two (2) real estate sales.

(Cert. Admin. R. at 571.) [16] The Indiana Board's final determination, however, must be reversed for several reasons.

First, while the Court advocates the Indiana Board's "balancing approach" [17] when determining how much

---

**16.** Given the fact that Unity Park's second obsolescence quantification calculation merely adjusted the figures determined in its first obsolescence calculation, the Indiana Board dismissed the calculation out-of-hand. (*See* Cert. Admin. R. at 570–72.) Consequently, the Indiana Board never addressed the method by which Unity Park calculated the present value of the federal income tax credits.

**17.** This Court has previously aligned itself with those jurisdictions that have held that federal tax incentives must be taken into consideration when evaluating whether rental restrictions do indeed cause low-income housing complexes to experience obsolescence. *See Pedcor Inv.–1990–XIII, L.P. v. State Bd. of Tax Comm'rs,* 715 N.E.2d 432, 437 and n. 10 (Ind. Tax Ct.1999). To that end, the Court also rejects Unity Park's argument that the

value of federal income tax incentives should be excluded in determining a property's market value because they represent intangible personal property. *See Rainbow Apartments v. Illinois Property Tax Appeal Bd.,* 326 Ill. App.3d 1105, 260 Ill.Dec. 875, 762 N.E.2d 534, 537 (2001) (holding that "Section 42 tax credits are not intangible property because they do not constitute a right to a payment of money, have no independent value, and are not freely transferable upon receipt"), *review denied. See also Pine Pointe Housing, L.P. v. Lowndes County Bd. of Tax Assessors,* 254 Ga.App. 197, 561 S.E.2d 860, 863–65 (2002) (holding that Section 42 tax credits were pertinent to the fair market value of real property because they had value to third-party purchasers and to taxpayers with federal income tax liabilities), *review denied; In the Matter of Ottawa Housing Assoc., L.P.,* 27 Kan.App.2d

obsolescence is actually present in a property, the evidence presented in this case clearly demonstrates a different outcome than the one the Indiana Board reached. Indeed, the Indiana Board reasons that because, in its view, Unity Park reaps a "double benefit" from its participation in the federal housing programs (not only does its investors receive the benefit of federal income tax incentives under the LIHTC program, but its HUD-mandated rental restrictions under Section 8 actually set contract rents above market rents), it is entitled to no obsolescence adjustment whatsoever. Thus, "to the extent that [Unity Park] is arguing that additional costs (insurance, administrative expenses, excess damages, etc.) [incurred as a result of participating in the federal housing programs] have created a burden, the value of the above market rents and tax credits *appear* to outweigh this increased burden." (Cert. Admin. R. at 570 (emphasis added).) Nevertheless, Unity Park offered probative evidence at the administrative hearing demonstrating that despite the fact that its investors received federal income tax incentives *and* despite the fact that it received above-market rents, it *still* suffered a 31.3% loss in property value. The Indiana Board has simply chosen to ignore Unity Park's evidence, in contradiction of the law. *See Clark,* 694 N.E.2d at 1235 (stating that "[t]he [Indiana] Board may not simply refuse to consider the taxpayer's evidence").

Second, the Indiana Board criticizes various calculations contained in Mr. Rassel's appraisal as being "flawed" or

1008, 10 P.3d 777, 780 (2000) (holding that federal income tax credits must be considered when determining the market value of a property because they represent investment tools which are considered by property buyers and sellers); *Parkside Townhomes Assocs. v. Bd. of Assessment Appeals,* 711 A.2d 607, 611 (Pa.

"suspicious." This, however, falls well short of the substantial evidence needed to support an Indiana Board final determination. A.I.C. § 33–26–6–6(e)(5). Indeed, the Indiana Board must offer an authoritative explanation in its determination discounting the taxpayer's prima facie case. *See Canal Square,* 694 N.E.2d at 804. Consequently, the Indiana Board needed to provide authority to support its conclusion that property taxes should not have been included as a Unity Park expense. Likewise, it needed to provided authority to support its conclusion that the capitalization rate should have been something other than 13%.

Finally, and perhaps most importantly, the burden was on the Assessor, and not the Indiana Board, to rebut Unity Park's prima facie case. When the Assessor failed to rebut Unity Park's case, the Indiana Board attempted to make the Assessor's case for him. This, however, was outside the scope of the Indiana Board's statutory authority. *See* IND. CODE ANN. § 6–1.5–4–1(a) (West 2002) (stating that the Indiana Board shall conduct an impartial review of all appeals concerning the assessed valuation of tangible property made from a determination by an assessing official or a county property tax assessment board of appeals).

## CONCLUSION

Unity Park has made a prima facie case that its property is entitled to a 31.3% obsolescence adjustment for the 2001 assessment year. Because the Assessor

Commw.Ct.1998) (rejecting taxpayer's argument that Section 42 credits are intangibles unrelated to the value of real estate). Consequently, this Court will only consider Unity Park's second obsolescence quantification to be relevant in this case.

failed to rebut Unity Park's prima facie case, the Indiana Board's final determination must be REVERSED. The Court hereby REMANDS the matter to the Indiana Board to instruct the Assessor to apply an obsolescence adjustment to Unity Park's assessment consistent with this opinion.