ATTORNEYS FOR PETITIONER:
**BENJAMIN A. BLAIR**
**BRENT A. AUBERRY**
**ABRAHAM M. BENSON**
FAEGRE DRINKER BIDDLE
& REATH LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**MARILYN S. MEIGHEN**
ATTORNEY AT LAW
Carmel, IN

**BRIAN A. CUSIMANO**
ATTORNEY AT LAW
Indianapolis, IN



FILED
Nov 19 2020, 4:31 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | | |
|---|---|---|
| LOWE'S HOME CENTERS, INC., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Cause No. 19T-TA-00017 |
| | ) | |
| MONROE COUNTY ASSESSOR, | ) | |
| | ) | |
| Respondent. | ) | |

## ON APPEAL FROM A FINAL DETERMINATION OF
## THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**November 19, 2020**

WENTWORTH, J.

Lowe's Home Centers, Inc. ("Lowes") appeals the Indiana Board of Tax of Review's final determination that established the assessed values of its real property for the 2014 through 2017 tax years. Specifically, Lowes contends that the Indiana Board erred in rejecting its sales comparison approach and income approach valuations and in excluding the obsolescence depreciation adjustments from its cost approach valuations. Upon review, the Court affirms the Indiana Board's final determination.

**FACTS AND PROCEDURAL HISTORY**

The subject property is a 134,791 square foot Lowe's store that sits on approximately 13 acres of land. (See Cert. Admin. R. at 120, 894-95.) The store was constructed in 1998 and is located within the Whitehall Crossing/Whitehall Plaza shopping center in Bloomington, Indiana. (See Cert. Admin. R. at 120, 142, 870, 898.) The Assessor valued the property for the 2014 through 2017 assessments as follows: $9,395,500; $9,406,400; $8,996,600; and $8,991,500. (See Cert. Admin. R. at 316.)

Believing those values to be too high, Lowes sought review first with the Monroe County Property Tax Assessment Board of Appeals and then with the Indiana Board. (Cert. Admin. R. at 1-35.) On March 26, 2018, after consolidating all of Lowes's petitions for review, the Indiana Board commenced a five-day administrative hearing. (See Cert. Admin. R. at 81-83, 807 ¶ 3.) During the hearing, both parties presented appraisals that valued the subject property for each of the years at issue using the sales comparison approach, the income approach, and the cost approach. (Cert. Admin. R. at 115-228, 318-520.) The Assessor also presented an appraisal review that critiqued Lowes's appraisal. (See Cert. Admin. R. at 523-643.)

The Indiana Board concluded that the Assessor's appraisal was unreliable because all of its valuations contained "major flaws[.]" (See, e.g., Cert. Admin. R. at 854 ¶ 136, 859 ¶ 152.) Neither party has challenged that finding on appeal.

<u>Lowes's Sales Comparison Approach Valuations</u>

Lowes's sales comparison approach valuations, prepared by Laurence G. Allen, an Indiana certified general appraiser, estimated the total value of its property by comparing it directly with other purportedly comparable properties that had sold in the

2

market.  (See Cert. Admin. R. at 171-92, 224, 942-43.)  See also 2011 REAL PROPERTY ASSESSMENT MANUAL ("Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2 (defining the sales comparison approach).  More specifically, Allen based each of the valuations on the fee simple sale of six properties with single-tenant freestanding retail stores.  (See Cert. Admin. R. at 171-72, 947-48.)  The six comparables were sold between December of 2011 and January of 2014, ranged in size from 103,540 square feet to 192,814 square feet, and were located in Indiana, Wisconsin, Michigan, and Illinois.  (See Cert. Admin. R. at 172, 948-82.)  After adjusting the sales price of each comparable to account for a variety of factors, including differences in their locations and the age and condition of their improvements, Allen concluded that the probable sales price of Lowes's property was between about $3.4 million and $3.6 million for the years at issue.  (See Cert. Admin. R. at 180-90, 192, 984-1023.)

Lowes's Income Approach Valuations

The income approach "is used for income producing properties that are typically rented[ and] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization."  Manual at 2.  (See also, e.g., Cert. Admin. R. at 193-205, 1033.)  Under this approach, Allen developed an estimate of market rent for each of the years at issue by using the factors from his sales comparison approach valuations to adjust the leases of twelve existing single-tenant retail stores located in Indiana and Illinois.[1]  (See Cert. Admin. R. at 194-97, 1044, 1051-55.)  Allen also considered the leases of four regional properties in Michigan, Missouri, and

---

[1] In developing his market rent estimates, Allen explained that he considered build-to-suit leases, but did not use them, because the unadjusted rents for those properties typically did not reflect market rent.  (See Cert. Admin. R. at 1033-36.)

3

Iowa.[2]  (See Cert. Admin. R. at 196-97, 1054-55.)  All of the sixteen lease comparables had triple net leases from as early as April of 2003 to as late as May of 2015 and their stores ranged in size from 60,000 square feet to 109,793 square feet.  (See Cert. Admin. R. at 194-97, 1040-41, 1044-52.)  Allen opined that the size differences between the lease comparables and the subject property likely resulted in a higher estimate of market rent per square foot given the inverse relationship between a property's size and rental rates.  (See Cert. Admin. R. at 194-95.)  To arrive at a final value conclusion, Allen completed several other steps, such as developing net operating incomes and capitalization rates, and settled upon values ranging between $3.7 million and $4.3 million for the years at issue.  (See Cert. Admin. R. at 197-205, 1055-73.)

Lowes's Cost Approach Valuations

Allen's cost approach valuations estimated the value of the land as if it were vacant and added the depreciated replacement cost of the improvements.  (See Cert. Admin. R. at 206-16, 1074, 1091-93.)  See also Manual at 2 (defining the cost approach).  With respect to the obsolescence depreciation adjustments, Allen explained that his review of a variety of sales, lease, and construction data indicated that Lowes's property suffered from obsolescence.  (See Cert. Admin. R. at 209-15, 1105-20, 1126-30.)  As a result, Allen quantified the obsolescence using the data from his income approach valuations, applied the resulting obsolescence depreciation adjustments to his preliminary valuations, and concluded that the final value of the subject property under the cost approach was between approximately $3.8 million and $4.3 million during the 2014

---

[2]  Allen's appraisal states that he considered the leases of five regional properties, but he testified that he actually only considered four additional leases because one of the properties was already included in his first set of comparables.  (Compare Cert. Admin. R. at 196-97 with Cert. Admin. R. at 1055.)

through 2017 tax years.  (See Cert. Admin. R. at 213-14, 216, 1121-26, 1130-31.)

## The Assessor's Appraisal Review

The Assessor's appraisal review, prepared by J. David Hall and Michael C. Lady, who are both Indiana certified appraisers, provided opinions on the completeness, accuracy, and credibility of Lowes's appraisal, not on its concluded value of its property. (See Cert. Admin. R. at 525-27, 625-628, 1263-64.)  After reviewing Lowes's appraisal and publicly available information, the appraisers stated that several parts of the appraisal were inadequate, unsupported, and unreasonable.  (See, e.g., Cert. Admin. R. at 555-619.)  For instance, the appraisers opined that Lowes's sales comparison approach valuations were not credible because the adjustments made to the six sales comparables were not sufficiently supported, appropriate, or reasonable.  (See, e.g., Cert. Admin. R. at 555, 1284-1391.)  The appraisers also indicated that Lowes's income approach valuations were unreliable given the poor quality of the data and lack of support for the final market rent estimates.  (See, e.g., Cert. Admin. R. at 601, 1399-1407.)  Furthermore, the appraisers claimed that Lowes's cost approach valuations were not credible because Allen's claims of obsolescence were questionable, and his obsolescence depreciation adjustments were quantified by using the unreliable income approach data.  (See, e.g., Cert. Admin. R. at 607, 1436-48.)

## The Indiana Board's Final Determination

On March 29, 2019, the Indiana Board issued its final determination that, among other things, examined the strengths and weaknesses of all of Lowes's valuations.  (See Cert. Admin. R. at 806, 847-54 ¶¶ 109-35.)  The Indiana Board found that Lowes's sales comparison approach valuations were not credible because the adjustments Allen made

5

to the six sales comparables failed to reflect the subject property's location, condition, and use. (See Cert. Admin. R. at 847-49 ¶¶ 110-18.) The Indiana Board also rejected Lowes's income approach valuations, finding that the market rent estimates lacked probative value for several reasons, including the use of questionable data and unsupported location adjustments. (See Cert. Admin. R. at 849-52 ¶¶ 119-25.) With respect to Lowes's cost approach valuations, the Indiana Board found them to be "minimally credible" if the obsolescence depreciation adjustments were excluded. (See Cert. Admin. R. at 852-54 ¶¶ 126-35.) Consequently, the Indiana Board eliminated the obsolescence depreciation adjustments from Lowes's cost approach valuations to arrive at final assessments of $5,946,914 for 2014, $5,677,455 for 2015, $5,358,355 for 2016, and $5,092,506 for 2017. (Cert. Admin. R. at 859-60 ¶¶ 153-54.)

On May 13, 2019, Lowes initiated this original tax appeal. The Court conducted oral argument on November 25, 2019. Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of showing that it is invalid. CVS Corp. v. Searcy, 137 N.E.3d 1053, 1055 (Ind. Tax Ct. 2019). Thus, to prevail on appeal, Lowes must demonstrate to the Court that the Indiana Board's final determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2020).

6

# LAW AND ANALYSIS

On appeal, Lowes contends that the Indiana Board's final determination must be reversed because it is contrary to law, constitutes an abuse of discretion, and is unsupported by substantial evidence. (See, e.g., Oral Arg. Tr. at 3-5.) More specifically, Lowes contends that neither the law nor the evidence supports the Indiana Board's findings that its sales comparison approach valuations were not credible, its market rent estimates from its income approach valuations lacked probative value, and its cost approach valuations were probative only if the adjustments for obsolescence depreciation were excluded. (See, e.g., Pet'r Initial Br. ("Pet'r Br.") at 1-2; Oral Arg. Tr. at 4.)

## I. Lowes's Sales Comparison Approach Valuations

Lowes claims that the Indiana Board erred in rejecting its sales comparison approach valuations because its finding regarding the desirability of the subject property's location in relation to the six sales comparables is not supported by substantial or reliable evidence. (See Pet'r Br. at 37-41; Pet'r Reply Br. at 16-21; Oral Arg. Tr. at 3-4, 31-36.) Lowes maintains that the Indiana Board discounted Allen's "years of appraisal experience" and, relying on its "apparent intuition about the strength of the Whitehall location, not data or any objective facts[,]" found that the subject property's location was "superior to all others[.]" (Pet'r Br. at 41; Oral Arg. Tr. at 36-37.)

As previously mentioned, both of the parties presented appraisals during the Indiana Board hearing to support their respective valuation positions. The Indiana Board determined that the appraisals demonstrated that Lowes's property was located in a successful thriving commercial area given its traffic counts and the fact that it was over

7

90% built up with, for example, several competing national chain retailers, discount retailers, restaurants, and grocery stores. (See Cert. Admin. R. at 808-09 ¶ 8, 849 ¶ 118 (citing, e.g., Cert. Admin. R. at 343, 345, 553).) In fact, the area was so built up and popular that new construction sites were created by purchasing existing buildings for demolition. (See Cert. Admin. R. at 343, 808-09 ¶ 8.) Along the same vein, the appraisal review provided that the traffic counts for the subject property were nearly equivalent to or higher than those of the sales comparables. (See Cert. Admin. R. at 562-64, 569-71, 575-77, 583-85, 590-92, 596-98.) On the other hand, evidence was presented that some of the sales comparables were located in areas with failing regional malls and a variety of shuttered retail businesses, not areas with thriving retail corridors like the subject property. (See Cert. Admin. R. at 580-82, 588-89, 593-95.)

Contrary to Lowes's claim, therefore, the Indiana Board's finding that Allen's comparables did not reflect Lowes's superior location was not based on "intuition." Instead, the finding was based on the weight of the evidence that laid bare the appraisers' opposing views regarding the desirability of the subject property's location. Time and again, this Court has explained that because the Indiana Board is the finder of fact, it, not the Tax Court, must weigh the evidence and judge the credibility of the witnesses who testified during the administrative proceedings. See, e.g., Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496, 498-99 (Ind. Tax Ct. 2010); Freudenberg-NOK Gen. P'ship v. State Bd. of Tax Comm'rs, 715 N.E.2d 1026, 1030 (Ind. Tax Ct. 1999), review denied. Here, the Indiana Board found that the Assessor's evidence concerning the desirability of the subject property's location was more persuasive than Lowes's evidence. (See, e.g., Cert. Admin. R. at 847-49 ¶¶ 112-18.) Having reviewed the administrative record, the Court

8

finds that substantial and reliable evidence supports the Indiana Board's finding, and thus, the Court cannot say that the Indiana Board erred in rejecting Lowes's sales comparison approach valuations.  See, e.g., Starke Cnty. Assessor v. Porter-Starke Servs., Inc., 88 N.E.3d 814, 820 (Ind. Tax Ct. 2017) (defining substantial evidence as "more than a scintilla[;]" it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion).

## II.  Lowes's Income Approach Valuations

Next, Lowes contends that the Indiana Board's finding that its market rent estimates lacked probative value is both contrary to law and not supported by substantial evidence because it was based on the identities of the lessees, creating an arbitrary standard for determining the comparability of retail rental properties.  (See Pet'r Br. at 8-17; Pet'r Reply Br. at 1-6; Oral Arg. Tr. at 4-10.)  Additionally, Lowes maintains that although several of the Indiana Board's other findings supported its rejection of Lowes's market rent estimates, they too are contrary to the law and not supported by substantial evidence.  (See, e.g., Pet'r Br. at 15-21; Pet'r Reply Br. at 6-8.)

## A.  Identities of the Lessees

Lowes claims that the Indiana Board found its market rent estimates were not probative because none of the lessees of the comparable leases were "national tier tenants[.]"  (See, e.g., Pet'r Br. at 8-9 (citing Cert. Admin. R. at 850-51 ¶¶ 121-22.)  Lowes asserts that the Indiana Board's steadfast focus on the lessees' identities rather than the general uses of the property was in direct contravention of Indiana Code § 6-1.1-31-6(e), the definition of market value-in-use, and this Court's case law.  (See, e.g., Pet'r Br. at 8-14 (citing, e.g., Howard Cnty. Assessor v. Kohl's Indiana LP, 57 N.E.3d 913 (Ind. Tax Ct.

2016), <u>review denied</u>; <u>Marion Cnty. Assessor v. Washington Square Mall, LLC</u>, 46 N.E.3d 1 (Ind. Tax Ct. 2015); <u>Millennium Real Estate Inv., LLC v. Benton Cnty. Assessor</u>, 979 N.E.2d 192 (Ind. Tax Ct. 2012), <u>review denied</u>; <u>Meijer Stores Ltd. P'ship v. Smith</u> (<u>Meijer I</u>), 926 N.E.2d 1134 (Ind. Tax Ct. 2010)).)  Lowes further claims that by analyzing the issue in the way that it did, the Indiana Board created an arbitrary comparability standard that equates the comparability of a retail rental property to a lessee's national tier status without describing any of the lessee's characteristics.  (<u>See</u> Pet'r Br. at 8-9, 12-16.)

As an initial matter, each of the authorities upon which Lowes has relied explain, in one way or another, that Indiana assesses real property on the basis of its "true tax value," which is not the value of the property to the user but rather is the property's "market value-in-use."  <u>See</u> IND. CODE § 6-1.1-31-6(e)-(f) (2020); Manual at 2; <u>Kohl's Indiana</u>, 57 N.E.3d at 916-19; <u>Washington Square Mall</u>, 46 N.E.3d at 9-10; <u>Millennium</u>, 979 N.E.2d at 195-96; <u>Meijer I</u>, 926 N.E.2d at 1136-39.  Market value-in-use, in turn, is defined as the value "of a property for its current use, as reflected by the utility received by the owner or by a similar user, from the property."  Manual at 2.  In light of this standard, the Court has explained that "'market value-in-use, as determined by objectively verifiable market data, is the value of a property <u>for</u> its use, not the value <u>of</u> its use'" because Indiana's property tax system taxes the value of real property, not business value, investment value, or the value of contractual rights.  <u>Kohl's Indiana</u>, 57 N.E.3d at 917 (citation omitted).) Nonetheless, these principles are not at issue because Lowes has misconstrued the Indiana Board's finding.

The paragraphs of an Indiana Board final determination may not be read in isolation, but must be read within the context of the finding of which they are a

10

part. In its final determination, the Indiana Board explains in at least seven separate paragraphs why Lowes's market rent estimates and thus its income approach are not probative. (See Cert. Admin. R. at 849-52 ¶¶ 119-25.) For example, the Indiana Board discounted Allen's lease comparables because the evidence indicated, among other things, that the leases were not typical big box build-to-suit leases and were for properties smaller than the subject property. (See, e.g., Cert. Admin. R. at 849-51 ¶¶ 119-22.) (See also, e.g., Cert. Admin. R. at 931 (where Allen testifies that "national retailers generally prefer to build their own store because each retailer has a certain strategy or business plan"), 935 (where Allen testifies that "[b]ig-box stores aren't built on a speculative basis like . . . an apartment or an office building . . . [because t]hey [are] built specifically for . . . the needs of [a] particular retail[er]").) Moreover, even though Allen indicated junior box and big box stores behave differently in the market, most of his lease comparables were leases for smaller junior box properties. (See, e.g., Cert. Admin. R. at 946 (where Allen discusses the relationship between junior box properties and big box properties).) Furthermore, Allen admitted that his use of smaller and older leases was less reliable than if he used more similar comparables. (See, e.g., Cert. Admin. R. at 194-95, 1205.)

When weighing evidence, the Indiana Board may reasonably consider the lessees' identity (e.g., national tier tenants, regional tier tenants, etc.) as one way to gauge the similarity, based on characteristics such as size and lease type, of purported comparable leases. It bears repeating, after all, that market value-in-use is the value "of a property for its current use, as reflected by the utility received by the owner or by a similar user, from the property." Manual at 2 (emphases added). Unpersuaded that the Indiana Board relied on a new comparability standard focused on the user of the property and satisfied

11

that it merely weighed the evidence and drew reasonable inferences therefrom, the Court cannot reverse this finding by substituting its judgment for that of the Indiana Board even if it disagrees with how the Indiana Board found the facts. See, e.g., Monroe Cnty. Assessor v. Kooshtard Prop. I, LLC, 38 N.E.3d 754, 756-57 (Ind. Tax Ct. 2015).

## B. Other Findings

Lowes further contends that six of the Indiana Board's other findings regarding Lowes's market rent estimates are not supported by substantial evidence. (See, e.g., Pet'r Br. 17-21; Pet'r Reply Br. at 6-8.) In general, those findings concerned the following subjects: the inverse relationship between a building's size and its rental rate, the use of junior box data, the Great Recession, the use of the Harrington Study, Allen's location adjustments, and the data used. (See, e.g., Pet'r Br. 17-21; Pet'r Reply Br. at 6-8.)

## 1. Inverse Relationship

The Indiana Board found Allen's opinion that an "inverse relationship of size to rent compensate[d] for the differences in size and age" between the subject property and the lease comparables unpersuasive because other evidence (i.e., Hall's appraisal review and testimony) demonstrated "that the inverse relationship was not reflected in Allen's [lease] comparables." (Cert. Admin. R. at 851 ¶ 123.) Lowes now claims that the Indiana Board erred because

> Hall conducted a "very simplistic" analysis of rental rates as compared to building size. Hall only compared building sizes to rental rates on a scatterplot graph. He admitted that he made no effort "to make specific adjustments for other elements of comparison here that might explain differences in rental rates." Hall placed his "results" on a scatterplot graph; this graph, he readily admitted, was not a regression analysis. . . . Hall's review was, at best, cursory and his resulting criticisms sketchy and unreliable. His rebuttal did not constitute substantial or reliable evidence.

12

(Pet'r Br. at 17-18 (citations omitted).)  (See also, e.g., Pet'r Reply Br. at 9-10.)

Lowes's claims attack the quality of the Assessor's evidence, characterizing Hall's scatterplot graph as "simplistic," his criticisms of its evidence as "sketchy," and his failure to complete a regression analysis problematic.  The record reveals, however, that Lowes did not discuss the relevance of a regression analysis during the administrative proceedings.  (See generally Cert. Admin. R. at 861-2126.)  Instead, it merely asked whether Hall's scatterplot graph was a "traditional regression analysis" and the answer to that question did not convince the Indiana Board to reject Hall's criticisms of Lowes's evidence.  (See, e.g., Cert. Admin. R. at 1596.)  Therefore, without something more, Lowes's claims on appeal simply invite the Court to do several things that it cannot do given the totality of the record evidence, i.e., find that the Indiana Board abused its discretion, reweigh the evidence, and then conclude that the reweighed evidence shows that Hall's scatterplot graph lacked probative value.  See Trimas Fasteners, 923 N.E.2d at 498-99 (providing that the Court may not reweigh the evidence absent an abuse of discretion).  Consequently, the Court will not reverse the Indiana Board's finding on this basis.

## 2.  Junior Boxes

In its final determination, the Indiana Board stated that "[m]ore than half [of the lease comparables] were substantially less than 100,000 square feet and none were greater than 110,000 square feet.  Most of the lease[ comparables] were for the type of properties that Allen considered junior boxes and that he intentionally excluded from his sales comparison analysis."  (Cert. Admin. R. at 850 ¶ 121.)  Lowes asserts that this finding is not supported by substantial evidence because Allen never stated that junior

13

boxes are a subcategory of big boxes nor did he state that he used junior box leases in his income approach valuations. (See, e.g., Pet'r Br. at 15; Oral Arg. Tr. at 18, 49.)

During the administrative hearing, Allen explained that properties like Lowes's are referred to as "big box" properties: i.e., "a[ny 80,000 square foot or larger] store that's just a big shell of a building, mostly [with] open areas that could be used by . . . [and is] typically built specifically, at least originally, for" entities like Menards, Walmart, Target, Kmart, Kohl's, Cabela's, or Bass Pro Shops. (See Cert. Admin. R. at 883-85.) Allen also testified that he avoided using junior box properties in sales comparison approach valuations

> [b]ecause the subject [property] was about 134,000 square feet, and there's a big difference between big-box stores and what I call like junior box stores, like much smaller retail boxes, like Best Buy or a supermarket generally . . . [that] are big boxes but not the same, I call them more like junior boxes. There's a different market for the . . . larger big-box stores.

(Cert. Admin. R. at 946.) Allen also explained that the rental rates of junior boxes are "much higher" than those of properties between 100,000 and 200,000 square feet. (See Cert. Admin. R. at 1021-22.) Thus, from Allen's own testimony it was reasonable for the Indiana Board to consider junior box properties as a subset of big box properties with stores ranging in size from 80,000 to perhaps just under 100,000 square feet. Consistent with the Indiana Board's finding, the majority of Allen's lease comparables, specifically nine of the sixteen comparables, were junior boxes. (See Cert. Admin. R. at 194, 197.) Moreover, an additional lease comparable did not meet Allen's definition of a big box property because the store was only 60,000 square feet. (See Cert. Admin. R. at 194.) Thus, the Court finds no basis for reversing the Indiana Board's finding with respect to this issue.

14

### 3. Great Recession

Lowes further asserts that substantial evidence does not support the Indiana Board's finding regarding the leases used to determine market rent, stating that "[a]ll but two of [the] . . . leases were [executed] prior to the Great Recession [of 2008], and none reflected the improved economy during the years at issue." (Pet'r Br. at 18 (citing Cert. Admin. R. at 850 ¶ 121).) (See also Cert. Admin. R. at 194, 926, 1004 (indicating that the Great Recession began in 2008).) Lowes explains that this finding disregards the evidence that shows that "Allen considered seven leases that were executed after that time – two on page 75 of his report and all five on page 78 of his report (ranging from August 2010 to May 2015)." (Pet'r Br. at 18 (citing Cert. Admin. R. at 194, 197).)

The Indiana Board's finding indicates that Allen's market rent estimates were derived from only one set of data, but the evidence shows they were based on Allen's review of sixteen lease comparables, and thus, derived from two sets of data. As such, six of the leases were executed prior to the Great Recession, not merely two. (See Cert. Admin. R. at 194, 197.) Nonetheless, the Indiana Board's mistake does not constitute reversible error in this case because the evidence is consistent with its finding, which explores the comparability of the properties based on when the majority of the leases were executed (i.e., before the Great Recession). (See Cert. Admin. R. at 850 ¶ 121.) Consequently, the Court will not reverse this finding either.

### 4. The Harrington Study

The Indiana Board's final determination also provides that "Allen's market rent data came from leases where the landlord was an atypical investor, and the tenant was an atypical tenant." (Cert. Admin. R. at 849-50 ¶ 119.) This finding was derived from the

15

Harrington Study, which provided "information, research and conclusions inferred from unadjusted sales data" of just over 200 properties with freestanding retail buildings ranging in size from 90,200 square feet to 231,500 square feet. (See Cert. Admin. R. at 246.) Lowes contends that the Indiana Board's finding "that the lessors and [lessees] for Allen's [lease comparables] were 'atypical' is legally invalid and is not based on the record evidence" because the Harrington Study does not estimate market rents or provide guidelines for estimating market rents. (See Pet'r Br. at 20.) The Court, however, is not persuaded for two reasons.

First, Lowes has not identified any legal authority in support of its claim that the Indiana Board's finding is "legally invalid." (See Pet'r Br. at 18-20; Pet'r Resp. Br. at 11-12.) The Court does not have an affirmative duty to make the case on behalf of a party; rather, the party is responsible for presenting arguments and directing the Court to the record evidence and authorities, whether binding or persuasive, that support its positions. See Marion Cnty. Assessor v. Simon DeBartolo Grp., LP, 52 N.E.3d 65, 68-69 (Ind. Tax Ct. 2016). Second, but just as importantly, the record evidence supports the Indiana Board's finding. (See, e.g., Cert. Admin. R. at 931-41 (explaining that 1) although retailers often use build-to-suit leases to finance the construction of big box properties, Allen avoided those types of leases in valuing the property because they usually do not reflect market rent and 2) because "there aren't a lot of tenants" for stores similar in size to Lowes's store, developers buy the properties and separate them into smaller leasable portions).) The Indiana Board's finding assumes that the Harrington Study properties represent the subject property's market by suggesting that the market primarily consists of build-to-suit leases. While this finding may not withstand scrutiny in all instances, the

16

Court will not disturb it in this case because it is supported by the evidence and has not been shown to be inconsistent with the law.  See, e.g., Trimas Fasteners, 923 N.E.2d at 502 (explaining that the valuation of real property is a formulation of an opinion, not an exact science); Bartholomew Cnty. Assessor v. Housing P'ships, Inc., 151 N.E.3d 821, 826-27 (Ind. Tax Ct. 2020) (explaining that fact sensitive cases stand on their own facts and, ultimately, how the parties present those facts).

### 5.  Location Adjustments

The Indiana Board also found that Allen's estimates of market rent did not "rationally reflect[] the desirability of the subject property's location relative to his lease comparables."  (Cert. Admin. R. at 851-52 ¶ 125.)  Lowes contends that because the Indiana Board criticized only two of Allen's lease comparables, its finding is not based on substantial evidence and just provides "conclusory observations, not analysis, in analyzing what it deems the most critical alleged 'shortcoming' in Allen's market rent analysis."  (Pet'r Br. at 21.)

Once again, Lowes has read the Indiana's Board finding in a vacuum.  As mentioned, the Indiana Board analyzed Lowes's income approach valuations within several paragraphs of its final determination and, in some instances, it explained that Allen did not disclose the basis for his time adjustments, made no effort to explain why certain properties were selected, and failed to discuss why the locations of the lease comparables were comparable to the subject property's location.  (See Cert. Admin. R. at 851-52 ¶¶ 124-25.)  In fact, Hall criticized Allen's income approach valuations because Allen failed to explain, both in the appraisal and while testifying, how the sales comparison factors that he considered influenced his ultimate market rent estimates.  (See, e.g., Cert.

17

Admin. R. at 1399-1401.)  Consequently, the Indiana Board's finding comports with the record evidence even though the evidence as to Allen's adjustments was scant.

### 6.  The Data

The Indiana Board's final determination further provides that "Allen cobbled together the best evidence of market rent he could find, but we are persuaded that there is insufficient market evidence to establish an income approach from his lease comparables." (Cert. Admin. R. at 850-51 ¶ 122.)  Lowes contends that the Indiana Board should have deferred to Allen's conclusion "that he had sufficient data to indicate a market rent for the [s]ubject [p]roperty" because nothing within the record contradicted Allen's conclusion.  (See Pet'r Reply Br. at 6-8.)

Lowes has alleged, but has been unable to establish, that several of the Indiana Board's findings with respect to the probative value of its market rent estimates were not supported by substantial evidence.  The findings reveal, however, that the Indiana Board identified many deficiencies in Allen's income approach methodology, as well as his lease comparables, that led it to conclude that the quality of his data was too poor to provide probative market rent estimates.  Lowes's own appraisal provides that "there is not a lot of leasing activity for existing big box stores especially for the size of the subject property [because u]nleased big box stores are most often sold to users rather than investors[.]" (Cert. Admin. R. at 195.)  Indeed, all of Lowes's complaints, including this one, have failed because the Indiana Board's findings were not only based on the evidence, but also were consistent with the law.  Accordingly, the Court will not disturb the Indiana Board's finding with respect to this issue.

18

### III. Lowes's Cost Approach Valuations

Finally, Lowes claims the Indiana Board's finding that its cost approach valuations were probative only if its obsolescence depreciation adjustments were excluded is contrary to law, constitutes an abuse of discretion, and is not supported by substantial evidence.  (See, e.g., Pet'r Br. at 2, 22-37; Pet'r Reply Br. at 12-16; Oral Arg. Tr. at 25-28.)  Specifically, Lowes argues that the Indiana Board's finding contradicts the case law that prohibits the Indiana Board from taking "the parts of [a] cost approach it likes and omit [the probative evidence of obsolescence because it is] the component[] that tie[s] the approach to the market value-in-use standard."  (See Pet'r Br. at 23-26 (citing, e.g., Trimas Fasteners, 923 N.E.2d at 501; Hometowne Assocs. v. Maley, 839 N.E.2d 269 (Ind. Tax Ct. 2005); Meridian Towers E. & W. v. Washington Twp. Assessor, 805 N.E.2d 475 (Ind. Tax Ct. 2003)).)  (See also, e.g., Pet'r Br. at 34-37; Pet'r Reply Br. at 13-16; Oral Arg. Tr. at 25-28.)   In addition, Lowes argues that the Indiana Board abused its discretion in excluding its obsolescence depreciation adjustments because it made a prima facie case for obsolescence during the administrative proceedings by identifying the causes of obsolescence and quantifying the obsolescence.[3]  (See, e.g., Pet'r Reply Br. at 13-16; Oral Arg. Tr. at 25-31.)

It is well established that the Indiana Board may not ignore a party's probative evidence when rendering its final determination.  See, e.g., Hometowne Assocs., 839 N.E.2d at 273-81; Clark v. State Bd. of Tax Comm'rs, 694 N.E.2d 1230, 1233-35 (Ind.

---

[3]  Lowes also claimed that the Indiana Board erred in excluding the obsolescence depreciation adjustments from its cost approach valuations because "[n]either appraiser placed primary weight on the cost approach [valuations], and neither appraiser testified that the cost approach [valuations], in the absence of other evidence, should be given sole weight."  (Pet'r Initial Br. at 23.)  Lowes, however, abandoned this claim during oral argument.  (See Oral Arg. Tr. at 23-25.)

Tax Ct. 1998). Moreover, when a taxpayer claims that obsolescence has diminished the value of its property, the taxpayer must present probative evidence that 1) identifies the causes of the alleged obsolescence and 2) quantifies the amount of obsolescence to be applied to its improvements. Wigwam Holdings LLC v. Madison Cnty. Assessor, 125 N.E.3d 7, 14 (Ind. Tax Ct. 2019). Neither argument is persuasive because, as previously stated, Lowes quantified the obsolescence through its income approach data that the Indiana Board determined to be unreliable and not probative. On appeal, Lowes has challenged, but failed to overturn, the Indiana Board's finding on that matter. Accordingly, the Indiana Board's rejection of Lowes's obsolescence depreciation adjustments was not contrary to law or an abuse of discretion, and it was supported by substantial evidence. See, e.g., CVS Corp., 137 N.E.3d at 1056-57 (explaining that an Indiana Board final determination constitutes an abuse of discretion when it is against the logic and effect of the facts and circumstances of the case). Consequently, the Court will not reverse the Indiana Board's final determination on this basis either.

## CONCLUSION

Lowes has not demonstrated to the Court that the Indiana Board erred in rejecting its sales comparison approach and income approach valuations or in excluding the obsolescence depreciation adjustments from its cost approach valuations. Accordingly, the Indiana Board's final determination in this matter is AFFIRMED.

20