Vern R. GRABBE, Petitioner,

v.

**CARROLL COUNTY ASSESSOR,**
Neda K. Duff, Respondent.

No. 49T10–1108–TA–51.

Tax Court of Indiana.

Dec. 31, 2013.

See also 1 N.E.3d 233, 2013 WL 6858795.

Vern R. Grabbe, Lee, IL, pro se.

Gregory F. Zoeller, Attorney General of Indiana, John P. Lowrey, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

WENTWORTH, J.

This case concerns whether the Indiana Board of Tax Review erred in upholding the 2009 assessment of Vern R. Grabbe's agricultural property. The Court finds it did not.

## FACTS AND PROCEDURAL HISTORY

The subject property, two contiguous parcels of agricultural land, is located in Carroll County. One parcel consists of 3.664 acres and contains one hog building ("the 020 parcel"); the second parcel consists of 19.266 acres and contains two hog buildings and a utility shed ("the 015 parcel"). For the 2009 tax year, the subject property was assessed at $274,500 ($30,900 for land and $243,600 for improvements).

Grabbe believed the assessment was too high and sought review first with the Carroll County Property Tax Assessment Board of Appeals and then with the Indiana Board. On February 22, 2011, the Indiana Board held a hearing during which Grabbe presented four self-prepared analyses to demonstrate that the assessed value of the subject property should only be $218,262. On June 21, 2011, the Indiana Board issued a final determination finding that each of Grabbe's analyses lacked probative value. Consequently, the Indiana Board upheld the assessment in its entirety.

On August 1, 2011, Grabbe initiated this original tax appeal. The Court heard oral argument on March 9, 2012. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

■ The party seeking to overturn an Indiana Board final determination bears the burden to demonstrate that it is invalid. *Hubler Realty Co. v. Hendricks Cnty. Assessor*, 938 N.E.2d 311, 313 (Ind. Tax Ct.2010). Consequently, Grabbe must demonstrate to the Court that the Indiana Board's final determination is arbitrary, capricious, an abuse of discretion, unsupported by substantial or reliable evidence, or otherwise not in accordance with law. *See* IND.CODE § 33–26–6–6(e)(1), (5) (2013).

## LAW

■ In Indiana, real property is assessed on the basis of its market value-in-use: the value "of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property." 2002 REAL PROPERTY ASSESSMENT MANUAL (Manual) (2004 Reprint) (incorporated by reference at 50 Ind. Admin. Code 2.3–1–2 (2002 Supp.)) at 2. To determine a property's market value-in-use, assessing officials refer to a series of

guidelines that explain the valuation process for both land and improvements. *See* REAL PROPERTY ASSESSMENT GUIDELINES FOR 2002—VERSION A (Guidelines) (incorporated by reference at 50 I.A.C. 2.3–1–2), Bks. 1 and 2. While assessments made pursuant to these guidelines are presumed to· be accurate, a taxpayer may rebut this presumption with evidence that indicates that the assessment does not accurately reflect the property's market-value-in-use. Manual at 5. "Such evidence may include actual construction costs, sales information regarding the subject or comparable properties, appraisals that are relevant to the market value-in-use of the property, and any other information compiled in accordance with generally accepted appraisal principles." *Id.* Moreover, the taxpayer must show that his suggested value accurately reflects the property's true market value-in-use (and, consequently, that the assessor's assessed value does not). *See Eckerling v. Wayne Twp. Assessor*, 841 N.E.2d 674, 678 (Ind. Tax Ct.2006).

## ANALYSIS

While Grabbe raises several issues on appeal,[1] the Court restates the dispositive issue as whether the Indiana Board's final determination must be reversed because it is unsupported by substantial and reliable evidence and is contrary to law. In support of his claim, Grabbe asserts that because he presented probative evidence consisting of his analyses using an allocation approach, a cost approach, an income approach, and a market data approach, the Indiana Board erred in upholding his property's $274,500 assessment.

### The Allocation Approach

■ Grabbe first provided an alternate value calculation based on the allocated April 17, 2008, sales price of his property. This allocation approach valued the subject property at $218,262 ($30,900 for the land and $187,362 for the hog buildings).[2] (*See* Cert. Admin. R. at 123–28.) To determine the value of the hog buildings, Grabbe allocated the subject property's April 17, 2008, sales price of $350,000 between each parcel, valuing the 020 parcel at $146,611 and the 015 parcel at $203,389. (*See* Cert. Admin. R. at 123–28.) From these figures, Grabbe deducted: (1) the value of the one-acre homesites on each parcel as recorded on the property record cards ($11,240 for the 020 parcel and $3,890 for the 015 parcel); (2) the value of the remaining land, which was based on Grabbe's "recollection" of the per acre sales price of nearby land ($14,098 for the 020 parcel and $96,831 for the 015 parcel); and (3) the value of the personal property located on the parcels at the time of sale ($9,021 for the 020 parcel and $27,558 for the 015 parcel) based on his 2009 personal property tax returns. (*See* Cert. Admin. R. at 123–28, 175–80, 313–14, 320–22.) Grabbe contends that the Indiana Board erred in determining that this approach lacked pro-

---

1. For example, Grabbe claims that the Indiana Board's final determination must be reversed because each paragraph of the final determination contains one or more errors. (*See* Pet'r Br. at 1–18.) Grabbe also claims that the Indiana Board showed bias because it failed to describe the subject property as "agricultural" or "farm" land, it repeatedly stated "Mr. Grabbe argues" or "Petitioner argues" instead of he "put forth" or he "testified[,]" and it merely *assumed* the Assessor used Indiana's assessment guidelines to assess his property. (*See* Pet'r Br. at 1–2, 4–5.)

These conclusory claims, however, are not dispositive.

2. Grabbe's land value of $30,900 was the same as the Assessor's valuation of the land. (*See* Cert. Admin. R. at 175–81.) In addition, it appears that Grabbe is not challenging the valuation of his utility shed because he only provided an estimate of value for his hog buildings. (*See, e.g.,* Cert. Admin. R. at 123–26.)

bative value because his allocation of value between the hog buildings, the personal property, the agricultural land, and the non-agricultural land was "logical." [3] (*See* Pet'r Br. at 7–8.)

Grabbe's allocation approach appears to incorporate two different appraisal methodologies, the allocation method and the abstraction method. The allocation method, which is used to estimate the value of land, "is based on typical ratios of land value to improvement value for specific categories of real property." Appraisal Inst., The Appraisal of Real Estate 335, 340 (12th ed.2001); *see also* INT'L ASS'N OF ASSESSING OFFICERS, PROPERTY ASSESSMENT VALUATION 88 (2nd ed.1996). The abstraction method, which is also used to estimate the value of land, "involves subtracting the depreciated replacement cost of improvements from the sale price of an improved property[; t]he remainder is an indication of the land value for that property." INT'L ASS'N OF ASSESSING OFFICERS, *supra*, at 88–89; see also APPRAISAL INST., *supra*, at 339–40. The certified administrative record, however, does not indicate whether Grabbe's use of these two methodologies comported with any generally accepted appraisal principles, which is required to rebut the presumption of accuracy accorded to an assessment made pursuant to Indiana's assessment guidelines. *See* Manual at 5.

For example, Grabbe explained how he allocated the sales price to each parcel, stating, "I allocated $146,611 as the purchase price to [the 020 parcel] and then I allocated $203,389 to [the 015 parcel]. Now again, I really don't care which way they go because the total is what I'm more interested in." (Cert. Admin. R. at 314.). Moreover, Grabbe did not present any evidence to show that his assumptions about how much of the purchase price to allocate were reliable by relating them, for example, to the market values-in-use of similar properties. *See* APPRAISAL INST., *supra*, at 340 (explaining that the allocation approach requires the use of market data). Consequently, the Court finds that the Indiana Board's determination that Grabbe's allocation approach lacked probative value was based on substantial evidence and consistent with the law.

### The Cost Approach

■ Grabbe also presented an estimated value of his property using a cost approach analysis, which valued the property at $188,320 ($30,900 for the land and $157,420 for the hog buildings).[4] (*See* Cert. Admin. R. at 208.) Grabbe estimated the value of the property under the cost approach by taking an obsolescence depreciation adjustment for the hog buildings' antiquated designs and use of lagoon manure storage systems. *See* note 4. (*See also* Cert. Admin. R. at 163–72, 322–27.)

---

**3.** Grabbe also claims the Indiana Board erred in discounting his testimony regarding the per acre sales price of the nearby land because he testified under oath and his testimony was not contradicted. (*See* Pet'r Br. at 6–8.) The Indiana Board discounted Grabbe's testimony because, among other things, he did not present any substantiating evidence. (*See* Cert. Admin. R. at 46–47.) The Court, therefore, finds Grabbe's claim improperly invites the Court to reweigh his testimony and assess his credibility, two functions that this Court may not undertake on appeal. *See Freudenberg–NOK Gen. P'ship v. State Bd. of Tax Comm'rs*,

715 N.E.2d 1026, 1030 (Ind. Tax Ct.1999), *review denied*.

**4.** Grabbe arrived at the $157,420 value by: (1) multiplying the adjusted rates of the buildings (as recorded on the property record cards) by their square footage; and (2) adjusting that figure by the amount of physical depreciation (as recorded on the property record cards) and obsolescence depreciation (as computed by Grabbe). (*See* Cert. Admin. R. at 163, 167, 208, 303–04.)

The Indiana Board determined that Grabbe's cost approach lacked probative value because it failed to link the identified causes of obsolescence to an actual loss in property value. (*See* Cert. Admin. R. at 49–50 (explaining, for example, that Grabbe did not show that a hog facility with a lagoon manure storage system was worth 15% less than a facility with a deep pit manure storage system).) Grabbe, however, claims that the Indiana Board's rejection of his cost approach seeks the "impossible" with respect to the quantification of obsolescence. More specifically, he explains that while the quantification of obsolescence involves the use of the sales comparison approach, a lack of sales data on hog facilities makes it virtually impossible to quantify the obsolescence affecting the subject property.[5] (*See* Oral Arg. Tr. at 39; Pet'r Br. at 9.)

The cost approach estimates the value of the land as if vacant and then adds the depreciated cost of the improvements as if new to arrive at a total estimate of value. Manual at 3. Functional obsolescence, the type of obsolescence at issue here, is a form of depreciation that reflects a loss of value caused by an improvement's *internal* inutilities. *See* Guidelines, Bk. 2, App. F at 4. Generally, the type of inutility present in an improvement influences the methodology used in quantifying functional obsolescence. *See* Guidelines, Bk. 2, App. F at 9–12; *see also, e.g.,* Appraisal Inst., *supra,* at 403–12. Thus, Grabbe was not limited to the use of the sales comparison approach to quantify the claimed functional obsolescence. Nonetheless, Grabbe failed to present any objective evidence other than his own conclusory assumptions, and therefore, the Indiana Board's determination that Grabbe's cost approach lacked probative value is based on substantial and reliable evidence and comports with the law.

## The Income Approach

■ Grabbe also presented an estimate of his property's value at $191,401 using an income approach analysis.[6] (*See* Cert. Admin. R. at 204.) Grabbe arrived at this value by deducting $47,558 in expenses (including $3,420 in property taxes) from the property's 2002 and 2003 gross rent of $90,000 to arrive at a net income of $42,442. (*See* Cert. Admin. R. at 204, 302.) Next, Grabbe applied a 20% capitalization rate to the net income, which was derived from the appraisal of another hog farm. (*See* Cert. Admin. R. at 204, 302.) To that figure (La, $212,210), Grabbe added a land value of $15,770 (as derived from the property record cards) and then de-

---

5. Grabbe also claims that the Indiana Board should have reduced the assessment on the 020 parcel because he established, and the Assessor agreed, that the measurements of the hog building on that parcel were overstated by 1,296 square feet. (*See* Cert. Admin. R. at 319–20, 374; Pet'r Br. at 10). The Indiana Board found, however, that Grabbe's market-based evidence did not establish that a reduction was proper. (*See* Cert. Admin. R. at 45 (explaining that the subject property's sales price less the value of the personal property still exceeded its assessed value).)

6. Under the income approach, the income expected to be earned by a property is estimated, allowing for reasonable expenses and other losses to arrive at net operating income (NOI). *Hometowne Assocs., L.P. v. Maley,* 839 N.E.2d 269, 275 (Ind. Tax Ct.2005). The NOI is then converted to a present value by dividing it by a capitalization rate which

> generally reflects the annual rate of return necessary to attract investment capital and is influenced by such factors as "apparent risk, market attitudes toward future inflation, the prospective rates of return for alternative investments, the rates of return earned by comparable properties in the past, the supply of and demand for mortgage funds, and the availability of tax shelters."

*Id.* (citation omitted).

ducted $36,579 of personal property for a total of $191,401. (*See* Cert. Admin. R. at 204, 302–03.)

The Indiana Board determined that Grabbe's income approach estimate lacked probative value because Grabbe improperly deducted property taxes as an expense and he did not support his use of a 20% capitalization rate.[7] (*See* Cert. Admin. R. at 48.) Grabbe contends, however, that the Indiana Board erred in determining that his income approach lacked probative value because the Indiana Board's "high standards" and "unreasonable requirements" regarding this approach effectively require taxpayers to submit appraisals to prove the invalidity of their assessments. (*See* Oral Arg. Tr. at 9–10; Pet'r Br. at 8–9.) According to Grabbe, that level of evaluation conflicts with current Indiana law that plainly provides that a taxpayer need not submit an appraisal to appeal an assessment. (*See* Pet'r Br. at 8–9.) *See also* Ind.Code § 6–1.1–15–3(f) (2010).

■ This Court has repeatedly stated that the valuation of property is the formulation of an opinion, not an exact science. *See, e.g., Millennium Real Estate Inv., LLC v. Assessor, Benton Cnty.,* 979 N.E.2d 192, 197 (Ind. Tax Ct.2012), *review denied; Stinson v. Trimas Fasteners, Inc.,* 923 N.E.2d 496, 502 (Ind. Tax Ct.2010). Nonetheless, Indiana law makes clear that the probative value of an opinion depends on whether the proponent of that opinion has shown that he adhered to generally recognized appraisal principles in formulating the opinion. *See* Manual at 3, 5.

This requirement remains the same whether an assessing official, an appraiser, or a taxpayer is the proponent of the opinion. *See, e.g., Inland Steel Co. v. State Bd. of Tax Comm'rs,* 739 N.E.2d 201, 220 (Ind. Tax Ct.2000) (explaining that an appraiser's use of a producer price index does not, in and of itself, establish that he complied with generally accepted appraisal standards), *review denied.* The Indiana Board, therefore, did not adopt an unreasonable requirement or apply some artificially high standard in determining the probative value of Grabbe's income approach.

Grabbe did not demonstrate that his deduction of property taxes as an expense was proper under generally accepted appraisal standards. *See Millennium,* 979 N.E.2d at 196–97 (discussing the propriety of deducting property taxes as an expense for *ad valorem* tax purposes). Moreover, while Grabbe's evidence provided that the capitalization rates of certain hog facilities ranged from 8% to 20%, he did not provide any evidence demonstrating why a rate of 20% is proper in this case or why the property from which he derived his 20% capitalization rate was comparable to his own property. (*See* Cert. Admin. R. at 204–07, 301–03.) Consequently, the Court finds that the Indiana Board's determination that Grabbe's income approach lacked probative value is supported by substantial and reliable evidence and is not contrary to law.

### The Market Data Approach

■ Finally, Grabbe calculated the value of his property using a market data

---

7. The Indiana Board also determined that Grabbe's income approach lacked probative value because he "only made vague references to 'predominate lease contract arrangements' to support his income estimate and unnamed 'universities and private sources' to support his expense calculations." (Cert. Admin. R. at 48.) This determination is not supported by substantial evidence because Grabbe's income and expense estimates were based on the subject property's actual income and expenses, not the cited data. Nonetheless, given the totality of the evidence, this error by itself does not warrant reversal of the Indiana Board's determination with respect to the probative value of Grabbe's income approach.

approach, which valued the subject property at $184,311 based on the sales data from three other hog farms (hereinafter, "the comparison farms"). (*See* Cert. Admin. R. at 210.) Thus, Grabbe's market data approach is comparable to the sales comparison approach to value, which "estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market." Manual at 3. Grabbe's market data approach involved four steps:

> Step 1) Determined the value of the hog buildings on the comparison farms by deducting from their total sales prices the value of the homes, certain land, and tool sheds on these properties;
>
> Step 2) Calculated the "price per pig space" of the hog buildings on the comparison farms by dividing the number of pig spaces in each building by the value of the building as determined in Step 1;
>
> Step 3) Determined the value of his hog buildings (which included the value of the personal property) by multiplying their price per pig space [8] by their number of pig spaces;
>
> Step 4) Arrived at a final estimate of value for his property by adding the value of the land and the value of the hog buildings, and then subtracting the value of the personal property.

(*See* Cert. Admin. R. at 210–17, 304–08.)

The Indiana Board determined that Grabbe's market data approach lacked

probative value because he neither explained nor submitted any documentary evidence to indicate how he determined the value of the homes, the other land, and the tool sheds on the comparison farms. (*See* Cert. Admin. R. at 50–51.) Grabbe claims, however, that the Indiana Board erred in finding that his market data approach lacked probative value because the certified administrative record contains evidence of the values of those items. (*See* Pet'r Br. at 10.) To support this claim, Grabbe directs the Court to three photocopied pages of an Indiana Board final determination in another case. (*See* Pet'r Br. at 10 (*citing* Ex. 2).) That evidence, however, was not presented to the Indiana Board during the course of the administrative proceedings in this case and, therefore, the Court may not consider it now. *See State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.*, 420 N.E.2d 1324, 1326–28 (Ind.Ct.App.1981) (explaining that the Court generally may not consider evidence that a taxpayer fails to submit to the Indiana Board); *see also* IND.CODE § 33–26–6–3 (2010). Accordingly, Grabbe failed to demonstrate that the Indiana Board's determination that his market data approach lacked probative value is unsupported by substantial and reliable evidence or is contrary to law.[9]

### CONCLUSION

For the above-stated reasons, the Court finds that the Indiana Board's determina-

---

8. Grabbe estimated his price per pig space at $42.50 because he believed his property was most like his third comparable, a hog facility located in another county, which he valued at $40.13 per pig space. (*See* Cert. Admin. R. at 210, 306–07.)

9. Grabbe also claims that the Indiana Board erred in permitting Brian Thomas of Ad Valorem Solutions to represent the Assessor during the Indiana Board hearing because the Power of Attorney form was defective: the Assessor was the named taxpayer, the last four digits of the social security number were

not provided, no employer identification number was provided, and the term of representation was improper (*i.e.*, "current—2020"). (*See* Pet'r Br. at 15–16, Ex. 5.) The Indiana Board found the Power of Attorney form contained the information required under 52 I.A.C. 2–3–2. (*See* Cert. Admin. R. at 36 n. 2). The Court, having reviewed the requirements of 52 I.A.C. 2–3–2, finds that the Indiana Board's determination is based on substantial and reliable evidence and is not contrary to law.

tion upholding the 2009 assessment of Grabbe's agricultural property is supported by substantial and reliable evidence and is not contrary to law. Accordingly, the Indiana Board's final determination is AFFIRMED.