ATTORNEY FOR PETITIONER:
**AYN K. ENGLE**
ATTORNEY AT LAW
Indianapolis, IN

ATTORNEY FOR RESPONDENT:
**PAUL M. JONES**
JONES PYATT LAW, LLC
Greenwood, IN

# IN THE
# INDIANA TAX COURT

FILED

Dec 12 2024, 4:10 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

LAKE COUNTY ASSESSOR,                )
                                     )
    Petitioner,                      )
                                     )
      v.                           )  Case No. 23T-TA-00015
                                     )
O'DAY HOLDINGS, LLC,                 )
                                     )
    Respondent.                      )

## ON APPEAL FROM A FINAL DETERMINATION OF
## THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**December 12, 2024**

MCADAM, J.

Under Indiana law, real property is valued separately from personal property. The taxpayer in this case presented real property appraisals that the Indiana Board of Tax Review determined likely included personal property and could not establish the true tax value of the real property. After finding that the appraisals proved the taxpayer's property was assessed too high, the Board reduced the assessments to the values established by the appraisals, finding that they nonetheless set an upper limit on the true tax value of the taxpayer's property. The Lake County Assessor contends that the Board's determination is contrary to law because it relies on an appraisal that includes

personal property and misapplies the burden of proof. The Court disagrees, holding that the Board may rely on an appraisal that includes personal property and that, in regular assessment appeals like this one, the taxpayer may satisfy the burden of proof by demonstrating that the assessment is incorrect and establishing a more accurate value. As such, the Court affirms the Board's final determination.

## RELEVANT FACTS AND PROCEDURAL HISTORY

Taxpayer O'Day Holdings, LLC owns a complex of six buildings, situated on 5.49 acres in Hammond, Indiana, that are used to fabricate various storage systems for big-box home improvement retailers. Two of these buildings are equipped with overhead cranes and craneways, which it uses to streamline the movement of raw steel across different workstations. For tax years 2014, 2015, 2018, 2019, and 2020, the assessed value of O'Day's property ranged from $1,438,400 to $1,605,400.

O'Day appealed each year's assessment to the Lake County Property Tax Assessment Board of Appeals ("PTABOA"). The PTABOA revised the assessments for 2014, 2015, and 2018, but did not review the 2019 or 2020 assessments. O'Day then appealed all of the assessments to the Indiana Board. The Indiana Board conducted a two-day hearing during which O'Day presented two appraisal reports that used both the cost and sales comparison approaches and estimated the property's value at $870,000 annually for 2014 and 2015 and at $800,000 annually from 2018 through 2020.[1]

At the hearing, O'Day's appraiser explained how he developed the sales

---

[1] The cost approach "estimates the value of the land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value." 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (amended 2020)) at 2. The sales comparison approach "estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market." *Id.*

comparison approach analysis. He testified that he identified sales of comparable industrial properties based on their use for manufacturing, fabrication, and storage, with particular emphasis on properties equipped with overhead cranes and craneways. For his sales comparison analysis in both appraisals, the appraiser initially selected eight comparable properties but ultimately relied on five properties he deemed most comparable to the subject property. He adjusted the sale prices of these five properties for various factors, including building size, land-to-building ratios, and condition. In the first appraisal covering 2014 and 2015, two of the five most comparable properties contained overhead cranes. After adjustments, the sale prices ranged from $4.06 to $9.54 per square foot, leading the appraiser to conclude a value of $9.50 per square foot for the subject property and, a rounded valuation of $867,000 annually for 2014 and 2015. In the second appraisal covering 2018 through 2020, one of the five most comparable properties contained overhead cranes, with the adjusted sale prices ranging from $3.85 to $9.17 per square foot. Based on these comparables, the appraiser settled on a value of $9.00 per square foot and a rounded valuation of $825,000 annually for 2018, 2019, and 2020. In his final reconciliation, the appraiser gave the most weight to the sales comparison approaches, concluding to annual values of $870,000 for 2014 and 2015 and $800,000 for 2018 through 2020.

On cross-examination, the appraiser acknowledged that overhead cranes may be classified as either personal or real property, with the distinction depending on whether they are removable or secured to the building. He testified that his sales comparison analyses did not account for this distinction because brokers typically do not disclose whether cranes are considered to be personal property or fixtures. When

3

pressed, he further acknowledged that the sales may have included overhead cranes but disclaimed any knowledge of how the assets were accounted for in the transactions between the buyers and sellers. He further opined that the impact of a crane on the sale price depends on the age and condition of the crane and the building. (*See* Cert. Admin. R. at 1099 (stating that "[a] crane in a building that's 40 years old . . . is not worth a lot of money" and "costs more to repair . . . than you get from the sale").)

In its final determination, the Indiana Board found that the sales used to develop O'Day's sales comparison analyses, "and by extension . . . [the] valuation opinions[,] . . . likely . . . include[d] cranes and . . . craneways[.]" (*See* Cert. Admin. R. at 905-06 ¶ 119.) However, the Board determined it could still rely on the appraisals, concluding that although their inclusion of personal property meant they did not support the appraiser's precise valuations, they established that O'Day's property is over-assessed and "suffice[d] to set a ceiling on the real property's market value-in-use." (Cert. Admin. R. at 907-08, 912 ¶¶ 124-25, 137.) The Board then ordered O'Day's assessments to be reduced to $870,000 per year for 2014 and 2015, and $800,000 for each year from 2018 through 2020.

The Assessor subsequently initiated this original tax appeal.

**STANDARD OF REVIEW**

This Court's review of Indiana Board decisions is governed by Indiana Code § 33-26-6-6, the provisions of which closely mirror those controlling judicial review of administrative decisions governed by Indiana's Administrative Orders and Procedures Act ("AOPA"). *Compare* IND. CODE § 33-26-6-6(e) (2024) *with* IND. CODE § 4-21.5-5-14(d) (2024). Under Indiana Code § 33-26-6-6, the party seeking to overturn a final

4

determination of the Board bears the burden of demonstrating its invalidity. I.C. § 33-26-6-6(b). Challengers must demonstrate that they have been prejudiced by a final determination of the Board that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. I.C. § 33-26-6-6(e).

## The Inclusion of Personal Property in a Real Property Appraisal Does Not Automatically Deprive the Appraisal of Probative Value

In resolving this case, the Board relied on appraisal valuations that included personal property when it determined that the O'Day appraisals set a ceiling on the true tax value of O'Day's real property. The Assessor contends that the Board's determination is contrary to law because an appraisal including personal property cannot be probative of real property value. She argues that any inclusion of personal property, regardless of its value, fundamentally undermines an appraisal's ability to accurately reflect real property value as the purpose of the appeal is to determine the value of the real property alone. She claims that the Board, because it found that the appraisals likely included some personal property, erred in relying on O'Day's appraisals. (*See* Oral Arg. Tr. at 4; Pet'r Br. at 8-11.)

Real and personal property are assessed separately in Indiana to ensure that valuations are just and uniform. *See BP Prods. N. Am., Inc. v. Matonovich*, 842 N.E.2d 901, 905-06 (Ind. Tax Ct. 2006), *review denied*. This separation, however, does not mean that the mere presence of one in a valuation of the other irreversibly taints the

5

whole valuation opinion. Rather, an appraisal's probative value depends on its adherence to generally recognized appraisal standards and its ability to provide a reliable measure of the property's true tax value. *See* 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (amended 2020)) at 3. This Court has never established a *per se* rule depriving real property appraisals of all probative value solely because they include personal property. While the best practice is to isolate and value only the real property components, the factfinder may account for the presence of personal property as it would any other defect, by determining the appropriate weight and credibility of the evidence. It is not a question of whether the evidence retains probative value, but of the extent of that probativeness. Valuation evidence that includes personal property may still tend to prove or disprove the value of real property, though to a lesser degree than evidence that excludes personal property.

Three cases illuminate the contours of the principle. The first case, *Hurricane Food v. White River Township Assessor*, 836 N.E.2d 1069 (Ind. Tax Ct. 2005), *review denied*, demonstrates that, where there is evidence indicating the value of personal property, the remedy is to account for it, not to discard the valuation evidence in its entirety. *Id.* at 1074-75. The assessor in that case adjusted an assessment to align with the real property's $700,000 sale price. *Id.* at 1074. The evidence itemized the purchase price and revealed that it included $180,000 of personal property. *Id.* The Court found that the adjustment was improper, not because personal property was included, but because the assessor failed to deduct its value. *See id.* The Court reversed the assessment and ordered it adjusted to account for the value of the personal property.

6

*Id.* at 1075.

The second case, *Kooshtard Property I, LLC v. Monroe County Assessor*, 38 N.E.3d 750 (Ind. Tax Ct. 2015), demonstrates that, when an appraisal includes multiple valuation approaches, those properly excluding personal property may be used to establish the true tax value of real property. *Id.* at 752-53. There, the claim was that an appraisal was not probative because one component included personal property. *Id.* The appraisal employed all three valuation approaches (i.e., the sales comparison, income, and cost approaches) to estimate the true tax value of a piece of land.[2] *Id.* at 752. The cost approach properly excluded personal property and valued the real property at $1,500,000 ($1,050,000 for land and $450,000 for improvements). *Id.* However, some of the comparable sales relied on to develop the sales comparison approach included personal property, ultimately valuing the real property at $1,400,000. *Id.* The Board accepted the appraisal after determining that it presented "a more comprehensive analysis" by relying on all three valuation approaches and adjusted the land value to match the value determined under the cost approach, $1,050,000. *Id.* at 753. This Court upheld the Board's reliance on the appraisal, holding that despite the "imperfection" in the sales comparison analysis (i.e., the inclusion of personal property in some of the comparable sales), the appraisal could still be used to value the land because the Board had relied on the portions that excluded personal property. *Id.* at 753-54.

The third case, *Mac's Convenience Stores, LLC v. Hendricks County Assessor*,

---

[2] The income approach, "used for income producing properties that are typically rented[,] . . . converts an estimate of income, or rent, the property is expected to produce into value through a mathematical process known as capitalization." 2011 Manual at 2*.*

191 N.E.3d 285 (Ind. Tax Ct. 2022), stands for the proposition that an appraisal that includes personal property cannot, by itself, establish the true tax value of a property. The Court rejected an appraisal that "valued more than real property" and included personal property that could not be disentangled from the value of the real property. *Id.* at 291. The appraisal, using only the sales comparison approach, valued a gas station with a convenience store. *Id.* at 286-87. The evidence showed that sales prices for such properties typically reflected the combined value of real and personal property, such as fuel pumps, underground storage tanks, walk-in coolers, and portable racks and shelves. *Id.* at 288. The evidence also showed that the appraiser had increased the sales prices of the comparable properties to account for the subject property's greater number of fuel pumps, thereby magnifying the impact of personal property on the real property valuation. *Id.* The Board found that the appraisal supported the assessments, reasoning that the evidence did not show that the included personal property "played a significant role" in the appraisal valuation. *Id.* (citation and internal quotation marks omitted). The Court reversed, finding that "the totality of the evidence demonstrate[d] that the appraisal report valued more than real property" and therefore could not support the assessment imposed by the assessor. *Id.* at 291. Unlike in *Hurricane Food* and *Kooshtard*, the personal property included in the appraisal in *Mac's* could not be separated from the real property values. *Id.* at 290 ("The [a]ssessor's evidence, however, did not reveal whether the five comparable properties used in the appraisal report (convenience stores that also sold fuel) included or excluded non-realty costs in their unadjusted sales prices.") (citation omitted).[3]

---

[3] Because the appraisal "relied exclusively on the sales comparison approach" without alternative methods that might exclude personal property, a *Kooshtard*-style analysis was

The Assessor points to the Court's statement in *Mac's* that, "the [a]ssessor 'did not present any authority, whether binding or persuasive, that would allow the Court to find that an appraisal is probative of the value of real property even if some personal property is included in the valuation." (*See* Pet'r Br. at 7-8 (quoting *Mac's*, 191 N.E.3d at 291 (citations omitted)).) She contends that this statement supports her view that the inclusion of any personal property robs an appraisal of all probative value. But, this statement cannot be read in isolation and must be understood in light of the Court's other decisions on the subject. Both *Hurricane Food* and *Kooshtard* make clear that valuation evidence does not automatically lose probative value simply because it includes personal property. *Mac's* does not reference either of these cases, and there is no indication that the Court intended to overrule them by implication. The factual context and analysis underlying the Court's decision in *Mac's* indicate that it was primarily animated by the pervasive and substantial amount of personal property and other non-realty value included in the challenged appraisal that could not be untangled from the real property value. This outcome was not simply due to the fact that some personal property was included in the appraisal. Moreover, the Court suggested that, had there been only a *de minimis* amount of personal property, the outcome may have been different. *See Mac's*, 191 N.E.3d at 291 (highlighting the *de minimis* doctrine applied in *Goshen Public Library of Elkhart County v. Department of Local Government Finance*, 128 N.E.3d 574, 580 (Ind. Tax Ct. 2019), *review denied*). The implication being that appraisals that include personal property are not devoid of probative value but instead may be assigned weight and credibility according to the degree of uncertainty created

---

impossible. *See Mac's Convenience Stores, LLC v. Hendricks Cnty. Assessor*, 191 N.E.3d 285, 287 (Ind. Tax Ct. 2022).

9

by the presence of the personal property.

Like *Mac's*, the present case turns on evidentiary issues regarding the allocation of value between real and personal property. In its final determination, the Board found that the O'Day appraisals "likely included some personal property" of an unknown amount. (*See* Cert. Admin. R. at 905-08, 912 ¶¶ 118-125, 137.) As a result, it concluded that the O'Day appraisals could not "support [the] precise valuation opinions" because the appraisals included both real and personal property. (*See* Cert. Admin. R. at 907-08 ¶ 124.) The Board's finding was proper and consistent with the law as it correctly concluded that the reconciled valuations in the O'Day appraisals could not, standing alone, establish the true tax value of the subject property. Instead, the Board determined that these appraisals established the valuations exceeded the true tax value by at least $527,000 to $772,500, thereby setting an upper limit on the assessed value. Unlike *Mac's*, the O'Day appraisals were not used to establish the true tax value of the property, which they were inadequate to do. Rather, they were used for a different purpose: to establish that the assessments were incorrect and to establish an upper limit on the value of the property. Therefore, the Court finds that the Board did not act contrary to law by relying on O'Day's appraisals, despite the likely inclusion of some personal property.

**The Board Applied the Correct Burden of Proof**

The Assessor next contends that the Board erred in concluding that "O'Day did not need to prove a specific value to be entitled to have its assessments reduced[,]" arguing that this conclusion effectively "absolves" O'Day of its burden of proof. (Pet'r Br. at 8 (internal quotation marks and citation omitted); Pet'r Reply Br. at 4-6.) She claims

10

that taxpayers seeking an assessment reduction must demonstrate both that "the assessment [is] incorrect" and "what the correct assessment should be." (Pet'r Br. at 9 (citations omitted); Oral Arg. Tr. at 4, 9-19, 51-53.) To satisfy her second prong, the Assessor maintains that the taxpayer must present a valuation that aligns with the meaning of "correct" in burden-shifting cases, namely, a valuation that is "precise and exact, free from error, or able to give a correct result." (Pet'r Br. at 10-11 (internal quotation marks omitted); Pet'r Reply Br. at 4-5.) By "correct assessment," the Assessor implies that the taxpayer's assessment may only be reduced if the taxpayer proves the true tax value of the appealed property, even if the evidence persuasively establishes an upper limit on true tax value that is lower than the assessment. She contends that the Board disregarded this burden of proof framework by accepting valuations that included personal property and concluding that these valuations "were in a sufficient range to justify" the assessment reductions. (*See* Pet'r Br. at 9-12; Pet'r Reply Br. at 4-6.)

The Assessor's contention underscores the need for clarity regarding the burden of proof in regular assessment appeals like this one. It requires the Court to define the burden of proof and address the relationship between the burden and true tax value. The burden itself does not originate from statute. The Legislature has not spoken to the burden to be applied in assessment appeals with respect to the years at issue in this appeal.[4] *See, e.g.*, IND. CODE §§ 6-1.1-4 & 6-1.1-15 (2014, 2015, 2018-2020). Instead, this Court has traditionally looked to the regulations governing assessments

---

[4] The Court's opinion does not consider Indiana Code § 6-1.1-15-20 because it applies only to appeals filed with the Board after March 21, 2022. *See* IND. CODE § 6-1.1-15-20 (2022). This appeal was filed before that date.

11

promulgated by the Department of Local Government Finance (the "Department") as the Legislature has delegated the responsibility to ensure that "assessments of properties . . . are uniform and equal[,]" to "[a]dopt rules concerning the assessment of tangible property[,]" and to establish rules for determining the true tax value of real property. *See, e.g.,* IND. CODE § 6-1.1-30-14 (2024); IND. CODE § 6-1.1-31-1(a)(3) (2014); IND. CODE 6-1.1-31-6(c) (2014) (amended 2016). In implementing these directives, the Department has adopted regulations that provide guidance on what must be proven in an assessment appeal. *See* 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("2002 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.) (repealed 2010)) at 5; 2011 Manual at 3; 2021 REAL PROPERTY ASSESSMENT MANUAL ("2021 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2020)) at 3.

These regulations provide that, when challenged on appeal, "[a]n assessment determined by an assessing official in accordance with [the Department's assessment] manual shall be presumed to be correct." *See, e.g.*, 2011 Manual at 3. They permit a taxpayer to present "[a]ny evidence relevant to the true tax value of the property . . . to rebut the presumption of correctness of the assessment." *Id.* They also provide the standard for determining the correctness of the assessment, stating that "[w]hether an assessment is correct shall be determined on the basis of whether, in light of the relevant evidence, it reflects the property's true tax value as defined in [the Department's assessment] manual." *Id.*

In accordance with these regulations, this Court has consistently articulated the taxpayer's burden as a requirement to demonstrate that the assessment does not accurately reflect the property's true tax value (i.e., its market value-in-use). *See, e.g.,*

12

*Eckerling v. Wayne Twp. Assessor*, 841 N.E.2d 674, 677 (Ind. Tax Ct. 2006);

*Indianapolis Racquet Club, Inc. v. Marion Cnty. Assessor*, 15 N.E.3d 150, 152-53 (Ind.

Tax Ct. 2014); *Piotrowski BK #5643, LLC v. Shelby Cnty. Assessor*, 177 N.E.3d 127,

132 (Ind. Tax Ct. 2021). Establishing the true tax value of a property and demonstrating

that it is different than the assessment is, of course, one way to prove the assessment

incorrect. *See Eckerling*, 841 N.E.2d at 678 (explaining that establishing the true tax

value of the subject property is sufficient but not necessary to meet the burden of proof).

As this case demonstrates, however, there are other ways to show that the assessment

is incorrect.

Here, the Assessor concedes that the Board correctly determined that the

assessment is incorrect. (*See* Oral Arg. Tr. at 12-13.) The question to be answered in

this case is what must be proven once it is established that the assessment is incorrect.

On this point, the Court's traditional articulation of the taxpayer's burden is incomplete.

Once a taxpayer has shown the assessment prescribed by the assessor is incorrect, it

necessarily follows that the taxpayer must establish an alternative value in its place as

the basis for taxation. The Department's regulations only require the taxpayer to

challenge the accuracy of the assessment itself. They are silent on what value may be

substituted in place of an incorrect assessment. Thus, the issue here is whether that

alternative value must be the true tax value of the subject property or whether it can be

an upper limit of true tax value that is lower than the assessment.

To date, Indiana courts have only considered whether an assessment's

incorrectness has been established by reference to the true tax value of the subject

property. *See, e.g.*, *French Lick Twp. Assessor v. Kimball Int'l Inc.*, 865 N.E.2d 732,

13

735-36 (Ind. Tax Ct. 2007); *Meijer Stores Ltd. P'ship v. Smith*, 926 N.E.2d 1134, 1136-39 (Ind. Tax Ct. 2010); *Grant Cnty. Assessor v. Ballinger*, 157 N.E.3d 34, 38-44 (Ind. Tax Ct. 2020). Those cases have primarily focused on the methodology and evidence needed to establish true tax value. *See, e.g.*, *O'Donnell v. Dep't of Loc. Gov't Fin.*, 854 N.E.2d 90, 94-95 (Ind. Tax Ct. 2006) (holding that evidence of methodological errors in the assessor's assessment and evidence for dates unrelated to the assessment date were insufficient to establish true tax value); *Meijer Stores*, 926 N.E.2d at 1136-39 (holding that the taxpayer's USPAP (Uniform Standards of Professional Appraisal Practice) compliant appraisal and other market-based evidence were sufficient to establish true tax value); *Marion Cnty. Assessor v. Square 74 Assocs.*, 228 N.E.3d 542, 545-47 (Ind. Tax Ct. 2024) (permitting the combination of a land value from the sales comparison approach with an improvements' value from the cost approach to determine market value-in-use where the evidence was consistent with accepted appraisal practices). They have not considered whether establishing true tax value is required to prevail. To the Court's knowledge, Indiana's courts have never been presented with a case like this one where the Board separately concluded that the evidence showed the assessment was incorrect without also concluding that the evidence established the true tax value of the property. As such, the question of an assessment's incorrectness has not been determined separately from the question of the property's true tax value. The second has always served as the basis for establishing the first: either the Board has found that the evidence establishes the true tax value of the property and thus proves the assessment is incorrect or the Board has found that the evidence cannot establish true tax value and has made no separate finding regarding the correctness of

14

the assessment.

In a limited number of cases, in *dicta*, this Court has characterized the taxpayer's burden as requiring proof of the true tax value of the subject property. *See, e.g.*, *Elkhart Cnty. Assessor v. Lexington Square, LLC*, 219 N.E.3d 236, 240-41 (Ind. Tax Ct. 2023); *Abraytis v. Porter Cnty. Assessor*, 220 N.E.3d 77, 80 (Ind. Tax Ct. 2023); *Grabbe v. Carroll Cnty. Assessor*, 1 N.E.3d 226, 228 (Ind. Tax Ct. 2013); *Pachniak v. Marshall Cnty. Assessor*, Case No. 49T10-0904-TA-18, 2010 WL 2284248, *2 (Ind. Tax Ct. June 8, 2010). In each of these cases, however, the burden of proof was not at issue. None of them presented challenges that required the Court to meaningfully consider the taxpayer's burden of proof. In *Lexington Square,* the Court simply noted the burden to draw a contrast with the burden of proof required by the so-called burden-shifting statute, Indiana Code § 6-1.1-15-17.2, in the course of deciding whether the Board had correctly applied that statute. *See id.* 219 N.E.3d at 242-46. In *Abraytis*, the Court considered whether the taxpayer provided adequate reasoning and legal authority to support her claim that the Board's final determination must be reversed. *See id.*, 220 N.E.3d at 80-82. The other two cases – *Grabbe* and *Pachniak* – were concerned with the probative value of the taxpayers' evidence. *Grabbe*, 1 N.E.3d at 228-33 (considering whether taxpayer-prepared allocation, cost, income, and market data analyses were sufficient to show the assessment's incorrectness); *Pachniak*, 2010 WL 2284248, *2-3 (considering whether neighboring properties justified reclassification of the taxpayers' parcels). None of these four cases required the Court to define or refine the legal standard for the taxpayer's burden of proof in regular assessment appeals like this one. Nor did they require the Court to apply the second prong (i.e., the requirement to prove

15

an alternative assessment value) articulated in the cases, as the Board made no finding in the first instance that the assessments were incorrect. Instead, the Court's focus remained on the insufficiency of the evidence and procedural shortcomings in the taxpayers' claims.

The correctness standard invoked by the Assessor is not applicable here. It is rooted in Indiana Code § 6-1.1-15-17.2, a burden-shifting statute repealed in 2022 that does not apply to this appeal. That statute shifted the burden of proof to the assessor, requiring the assessor to prove an assessment was "correct" when the assessed value increased by more than 5% over the prior year in certain instances. IND. CODE § 6-1.1-15-17.2(b) (2019) (repealed 2022). If the assessor failed to prove the assessment was correct and the taxpayer failed to establish the true tax value, the statute provided that the assessment reverted to the prior year's value. I.C. § 6-1.1-15-17.2(b). Even when it was in effect, this burden-shifting framework applied only to specific appeals governed by that statute, not to regular assessment appeals like this one. I. C. § 6-1.1-15-17.2(a). The statute did not purport to establish the burden of proof for regular assessment appeals like this one. In fact, the burden it articulates (i.e., for the assessor to prove the assessment correct) is exactly the opposite of the burden the Department's regulations articulate for regular assessment appeals (i.e., for the taxpayer to prove the assessment incorrect). This mirroring reflects the shift in the burden of proof from the taxpayer to the assessor. Therefore, the Assessor's reliance on this repealed and inapplicable statute is misplaced.[5]

---

[5] The Assessor further argues that applying this correctness standard to assessors in burden-shifting appeals, but not to taxpayers in other appeals, creates an unfair disparity. However, the Legislature adopted the burden-shifting framework to address specific concerns about certain assessment increases exceeding 5%, concerns that do not arise in other types of appeals. *See*

16

Indiana's property assessment appeals process is designed to ensure fair assessments based on the best available information. *See State Bd. of Tax Comm'rs v. Town of St. John*, 702 N.E.2d 1034, 1040 (Ind. 1998) (stating that property taxation does not require absolute precision but must provide taxpayers a reasonable opportunity to challenge the application of statutory and regulatory assessment systems). The mass appraisal system is intended to provide a reasonably accurate estimate of true tax value on a large scale. It is not expected to yield the precise true tax value in every instance. *Eckerling*, 841 N.E.2d at 676-77. Such perfection is not the objective. It is intentionally designed to balance accuracy and prudential concerns like cost, efficiency, and speed. Accuracy could be improved by individually assessing every property before fixing its assessment but that would come at an enormous cost and require significantly more time and resources. This tradeoff is the reason for the appeal process. While the goal of the assessment system is to determine true tax value, the purpose of an appeal is to test whether the assessment imposed by the assessor is consistent with market-based evidence. *See P/A Builders & Devs., LLC v. Jennings Cnty. Assessor*, 842 N.E.2d 899, 900-01 (Ind. Tax Ct. 2006), *review denied*.

As the preceding discussion reveals, neither statute, nor regulation, nor precedent dictate what value a taxpayer must prove once it is established that the assessment is incorrect. The law does not specify whether a taxpayer may prevail if they establish a value that is lower than the assessment or whether a taxpayer may only prevail by establishing the true tax value of the subject property. The question is left to

---

*Crandall v. Bartholomew Cnty. Assessor*, Case No. 23T-TA-00004, 2024 WL 4344758, at *5 (Ind. Tax Ct. Sept. 30, 2024). Any differing treatment reflects the Legislature's deliberate choice to tailor the burden of proof to the unique circumstances of substantial assessment increases, based on its policy judgment. *See id.*

the courts, and resolution of this case requires a choice.

The reversionary clause in the now-repealed burden-shifting statute, Indiana Code § 6-1.1-15-17.2, offers some guidance for how best to resolve the question. Under that statute, failure to prove true tax value triggered the substitution of the prior year's assessment. I. C. § 6-1.1-15-17.2(b). The statute did not declare that the prior year's assessment represented the true tax value of the property for the current year. I. C. § 6-1.1-15-17.2. Such a conclusion would ignore basic market forces and economic trends. Instead, the statute reflected a legislative judgment that the prior year's value was a preferable alternative to an unsupported assessment. Likewise, the Court is persuaded that a similar principle should apply in regular assessment appeals like this one where the taxpayer has shown the assessment to be incorrect. Perfect need not be the enemy of the good. While the ideal outcome is to determine the subject property's true tax value, property valuation is more art than science and the evidence does not always permit such exactitude. *See Stinson v. Trimas Fasteners, Inc.*, 923 N.E.2d 496, 502 (Ind. Tax Ct. 2010) ("The valuation of property is the formulation of an opinion; it is not an exact science."). A persuasive and specific estimate of the upper limit of a property's true tax value is preferable to an assessment that has been convincingly proven to be too high. In such cases, the appropriate relief is to adjust the assessment based on the available evidence and establish a more reasonable value. Neither statute nor the Department's regulations require the Board to overtax a taxpayer by hundreds of thousands of dollars when it is persuaded that the property's value is lower.

The Board concluded that the inclusion of personal property in the O'Day appraisals yielded valuations that were higher than the true tax value of the real

18

property alone but lower than the assessments imposed by the Assessor. Thus, even though the inclusion of personal property in the O'Day appraisals precludes a precise determination of the real property's true tax value, as the Assessor concedes, they are more than adequate to establish that the assessments are too high and fix an upper limit on the value of the property. Accordingly, the Court finds that the Board's conclusion of over-assessment was consistent with the law.

## CONCLUSION

For the forgoing reasons, the Court AFFIRMS the Board's final determination.